

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
NOV 2 9 2004    3:34pm
Betty A. Griess, Clerk
Cheyenne

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| TIMOTHY J. MORRISON, et al., | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-CV-0123-J |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR; GALE NORTON, | ) | |
| et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GREATER YELLOWSTONE | ) | |
| COALITION, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

---

**OPENING BRIEF**
By Appellant State of Wyoming

---

Patrick J. Crank, Attorney General
Jennifer A. Golden, Deputy Attorney General
Jay A. Jerde, Senior Assistant Attorney General
Thomas W. Rumpke, Senior Asst. Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, Wyoming 82002
Telephone: (307) 777-6946
Facsimile: (307) 777-3542

Attorneys for Appellant State of Wyoming

# TABLE OF CONTENTS

Page

TABLE OF CASES AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . .   i

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

ARGUMENT

     I.     THE FEDERAL DEFENDANTS ACTED ARBITRARILY,
           CAPRICIOUSLY, AND NOT IN ACCORDANCE WITH
           LAW IN REJECTING THE WYOMING PLAN. . . . . . . . . . .   24

     II.    THE REJECTION OF THE WYOMING PLAN
           VIOLATES THE TENTH AMENDMENT. . . . . . . . . . . . . .   42

     III.   BY REJECTING THE WYOMING PLAN, THE
           FEDERAL DEFENDANTS HAVE UNLAWFULLY
           WITHHELD AGENCY ACTION. . . . . . . . . . . . . . . . . . . . . .   44

     IV.   REMEDY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

APPENDICES
     A - Wyo. Stat. Ann. § 23-1-304
     B - 2003 Wyo. Sess. Laws ch. 115

# TABLE OF CASES AND AUTHORITIES

<u>FEDERAL CASES</u>                                                                                               <u>Page</u>

*Am. Wildlands v. Norton*, 193 F.Supp.2d 244 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Bennett v. Spear*, 520 U.S. 154, 176 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . 21

*Bldg. Indust. Ass'n of Superior, California v. Norton*, 247 F.3d 1241 (D.C. Cir. 2001) . . . . . . . 33

*Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Colorado Envt'l Coalition v. Dombeck*, 185 F.3d 1162 (10th Cir. 1999) . . . . . . . . . . . . . . . . . 22

*Colorado Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171 (10th Cir. 2000) . 25

*Custer County Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . 22

*Doyal v. Barnhart*, 331 F.3d 758 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gordon v. Norton*, 322 F.3d 1213 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Kelley v. United States*, 69 F.3d 1503 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220 (10th Cir. 2002) . . . . . . . . . . 46

*Moisa v. Barnhart*, 367 F.3d 882 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Natural Resources Defense Council, Inc. v. Envtl. Protection Agency*, 22 F.3d 1125 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . 33

New York v. United States, 505 U.S. 144 (1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Norton v. Southern Utah Wilderness Alliance*, — U.S. —, 124 S.Ct. 2373 (2004) . . . . . . 21, 44, 45

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) . . . . . . . . . . . . . . . 41, 46

*Pennaco Energy, Inc. v. United States Dep't of Interior*, 377 F.3d 1147 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 26

*Public Serv. Co. of Colo. v. United States Envtl. Protection Agency*, 225 F.3d 1144 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Smiley v. Citibank*, 517 U.S. 735 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58 (D.C. Cir. 2000) . . . . . . . . . . 33

*Squaw Transit Co. v. United States*, 574 F.2d 492 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . 36

FEDERAL STATUTES

16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

16 U.S.C. § 1540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 25

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21, 22, 23

H.R. Rep. No. 97-567 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

STATE STATUTES

HB229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 30, 39

Wyo. Stat. Ann. § 23-1-304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FEDERAL REGULATIONS

50 C.F.R. § 424.11(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32, 45

## INTRODUCTION

The United States Department of the Interior ("Interior") and the United States Fish and Wildlife Service ("FWS") totally disregarded the Endangered Species Act ("ESA") in rejecting the Wyoming Gray Wolf Management Plan ("Wyoming Plan") adopted by the Wyoming Game and Fish Commission ("Commission"). The FWS, instead of evaluating the adequacy of the Wyoming Plan "solely on the basis of the best scientific and commercial data available" as demanded by the ESA, chose to reject the Wyoming Plan based on their arbitrary and capricious determination that the dual classification of wolves as trophy game animals and predatory animals in the Wyoming Plan will result in future litigation by environmental groups and may result in other states adopting similar plans.

The FWS, after ignoring binding, non-discretionary commands of the United States Congress, rejected the Wyoming Plan and informed Wyoming, Idaho, and Montana that the delisting of the western gray wolf will not occur until such time as the Wyoming Legislature and the Commission pass legislation and adopt a plan dictated by the political and litigation fears of Interior. Such actions are not required by the ESA and, in fact, such actions are unlawful under the Administrative Procedure Act ("APA") and the ESA. If this Court does not intercede, Wyoming's wildlife resources will suffer significant and permanent harm.

As with most federal mandates foisted on the states, the federal government controls how the mandate will proceed. The same was true with the reintroduction of wolves in Wyoming. The FWS has dictated what recovery objectives must be met, which wolves may be destroyed for causing livestock losses, and what control Wyoming can exert to try and minimize impacts on Wyoming's other wildlife resources.

The same was true as the FWS allegedly moved towards delisting the wolf from "endangered" to "threatened" and ultimately to the removal of wolves from the endangered species list altogether. The FWS set the numbers of wolves that must be in Wyoming, Idaho, and Montana. The numbers of wolves now far exceed recovery goals. All of the requirements for delisting have been met except, in the FWS's unlawful view, the existence of adequate regulatory mechanisms.

1

The FWS determined that 12 wolf experts must review the Idaho, Montana, and Wyoming wolf management plans to ensure that, collectively, adequate regulatory mechanisms are in place to conserve a sustainable wolf population.  Ten (10) of the 11 peer reviewers picked by the FWS concluded that the Wyoming Plan passed muster under the ESA.  Numerous officials from Interior and the FWS have stated that the rejection of the Wyoming Plan is not based upon biological factors as demanded by the ESA, but is based on political paranoia and fear of lawsuits by environmental groups.

The FWS set the rules and Wyoming complied at each stage of the process.  At the conclusion of the process, the FWS chose to ignore the law and this Court has no choice but to reverse the final decision by the FWS in this matter.

The FWS has filed an administrative record with this Court.  Presumably, this record should support the decision made by the FWS.  However, the exact opposite is true.  The record filed by the FWS does not support the unlawful rejection of the Wyoming Plan.  The only evidence in the record concerning biological factors, in fact, supports the approval of the Wyoming Plan.

While the State of Wyoming recognizes FWS's Commerce Clause powers to regulate endangered species, the FWS has severely compromised Wyoming's sovereignty and has gone far beyond any power granted to the federal government by the United States Constitution.  The FWS's actions have violated Wyoming's Tenth Amendment rights to manage other wildlife resources within Wyoming and to act as a sovereign.

Interior and the FWS have acted shamelessly in this matter.  They have blatantly ignored federal law and have tried to force Wyoming to accept their idea of what Wyoming's statutes should provide for.  If we are to be a nation of laws, then the most powerful of the actors must follow the law.  The federal government has far exceeded any power it has in this area and this Court must strike down the ultra vires acts of Interior and the FWS.

## STATEMENT OF JURISDICTION

This action challenges the legality of the Federal Defendants' rejection of the Wyoming Plan on January 13, 2004. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 5 U.S.C. §§ 701-706, and 16 U.S.C. §§ 1540(g)(1)(C), (2)(C).

## STATEMENT OF THE ISSUES

I.     Did the Federal Defendants act arbitrarily, capriciously, or otherwise not in accordance with law by rejecting the Wyoming Plan?

II.    Have the Federal Defendants violated the Tenth Amendment to the United States Constitution by refusing to propose a rule to delist the gray wolf until Wyoming changes its state law to conform with the demands of the Federal Defendants?

III.   Did the Federal Defendants unlawfully withhold or unreasonably delay agency action by rejecting the Wyoming Plan based upon considerations other than the best scientific and commercial data available?

## STATEMENT OF THE CASE

Wyoming seeks judicial review of the Federal Defendants' actions in reviewing the Wyoming Plan under the "adequate regulatory mechanisms" requirement for delisting a species under the ESA. In July 2003, the Wyoming Game and Fish Department ("Department") submitted the final Wyoming Plan to the Federal Defendants for their review and approval. (AR 194-236). The Federal Defendants rejected the Wyoming Plan on January 13, 2004. (AR 505-507).

On April 22, 2004, Wyoming filed a civil action in this Court seeking judicial review under the APA of the Federal Defendants' rejection of the Wyoming Plan and their failure to properly manage the gray wolf population living in Wyoming. That same day, Wyoming provided written notice of its intent to commence suit under the ESA. (AR 538-542). On June 22, 2004, Wyoming amended its complaint ("FIRST AMENDED COMPLAINT") to add an ESA claim. The Federal Defendants filed their answer to the amended complaint on July 21, 2004.

3

On September 21, 2004, a group of organizations ("the Wolf Coalition") filed suit in this Court seeking judicial review of the Federal Defendants' rejection of the Wyoming Plan and their failure to properly manage the gray wolf population living in Wyoming.  On November 17, 2004, this Court consolidated the two cases and ordered that all issues relating to the rejection of the Wyoming Plan and the jurisdictional issues relating to the failure to manage claims shall be addressed first, and the non-jurisdictional issues relating to the failure to manage claims shall be addressed in a bifurcated proceeding, if necessary.

## STATEMENT OF THE FACTS[1]

### Reintroduction of the Gray Wolf to the Northern Rocky Mountain Region

Before 1870, gray wolves commonly inhabited the territory that eventually became the State of Wyoming.  By 1930, government predator control programs had eliminated gray wolves from the western United States, including Wyoming.

Upon enactment of the ESA in 1973, the Secretary of the Interior ("Secretary") listed the northern Rocky Mountain gray wolf subspecies (*Canis lupus irremotus*) as an endangered species. (AR 823).  To eliminate problems associated with listing the separate subspecies of the gray wolf, the Secretary subsequently relisted the gray wolf at the species level (*Canis lupus*) as endangered throughout the conterminous 48 States, except for Minnesota, in March 1978.  (AR 823).

In November 1994, the Federal Defendants issued a final rule which authorized the introduction of experimental, non-essential gray wolf populations into Yellowstone National Park and

---

[1] In the index for the administrative record, the Federal Defendants identified numerous documents that they have withheld from the administrative record because the documents allegedly are either pre-decisional/deliberative in nature or are attorney-client communications. These documents are not a part of the administrative record on review and therefore cannot be considered by this Court in deciding the claims asserted by Wyoming in this case.  In addition, by not challenging the decision to exclude these documents from the administrative record in this case, Wyoming in no way waives any claims or arguments it may have regarding the pre-decisional/deliberative or attorney-client status of the documents in the Freedom of Information Act lawsuit it has filed in U.S.D.C. (Wyo.) Case Number 04-CV-213-J.

into central Idaho. (AR 823). In 1995, the FWS released 14 gray wolves from southwestern Canada into Yellowstone National Park. (AR 832). In 1996, the FWS released an additional 17 southwestern Canadian gray wolves into Yellowstone National Park. (AR 832).

### Recovery Goals for the Gray Wolf in the Northern Rocky Mountain Region

In 1980, the United States Fish and Wildlife Service ("FWS") approved the Northern Rocky Mountain Wolf Recovery Plan. (AR 828). The FWS revised the Northern Rocky Mountain Wolf Recovery Plan in 1987 ("1987 Recovery Plan"). (AR 828). The 1987 Recovery Plan defined a recovered wolf population as securing and maintaining a minimum of 10 breeding pairs in each of three geographically separate recovery areas (northern Montana, central Idaho, and the greater Yellowstone area) for a minimum of three successive years. (AR 832, 834).

In an environmental impact statement ("EIS") completed in 1994, the FWS defined a recovered wolf population as "[30] or more breeding pairs of wolves (defined as an adult male and an adult female that raise at least two pups until December 31 of the year of their birth) comprising some +300 wolves in a metapopulation with some genetic exchange between sub-populations for three successive years." (AR 834). In 2002, the FWS adopted the 1994 EIS definition as the new definition of a recovered wolf population in the Western Distinct Population Segment ("Western DPS"). (AR 834-835).

### Recovery Progress of the Gray Wolf in the Northern Rocky Mountain Region

After gray wolves were introduced into Yellowstone National Park, the gray wolf population in the northern Rocky Mountain region grew from 101 wolves and 8 breeding pairs in 1995 to 322 wolves and 24 breeding pairs in 1999. (AR 832). In 2000, the gray wolf population had a minimum of 433 wolves and 30 breeding pairs, with at least 119 wolves in eight packs living in Yellowstone National Park and approximately 36 wolves in six packs living in Wyoming outside of the borders of Yellowstone National Park. (Compl., ¶ 32; Answ., ¶ 32).

5

In 2001, the gray wolf population had a minimum of 563 wolves and 34 breeding pairs, with at least 131 wolves in ten packs living in Yellowstone National Park and at least 56 wolves in eight packs living in Wyoming outside of Yellowstone National Park.  (Compl., ¶ 33; Answ., ¶ 33).

In 2002, the gray wolf population had a minimum of 663 wolves and 43 breeding pairs, with at least 148 wolves in 14 packs living in the Yellowstone National Park and 67 to 81 wolves in eight packs living in Wyoming outside of Yellowstone National Park.  (Compl., ¶ 34; Answ., ¶ 34).

In 2003, the gray wolf population had a minimum of 761 wolves and 51 breeding pairs, with at least 174 wolves in 14 packs living in Yellowstone National Park and 76 to 88 wolves in eight packs living in Wyoming outside of Yellowstone National Park.  (Compl., ¶ 35; Answ., ¶ 35).

### The Development of the Wyoming Plan

In response to the dramatic recovery progress of the gray wolf, the Department began developing a gray wolf management plan in anticipation of the eventual delisting of the gray wolf. In September 2002, the Commission adopted a proposal that called "for wolves to be classified as 'trophy game animals' within Yellowstone and Grand Teton [N]ational [P]arks, and designated wilderness areas of the Bridger-Teton and Shoshone national forests in northwestern Wyoming ... and 'predatory animal' status for wolves throughout the remainder of the state."  (AR 32).

In September 2002, the Department asked Defendant Williams whether the proposed dual classification of wolves as trophy game and predators within the specified geographic areas would satisfy the "adequate regulatory mechanisms" criteria for delisting to commence.  (AR 32).  On September 26, 2002, Defendant Williams responded to the Department's question, explaining that "[w]olves will need legal protection from unregulated human mortalities under State law *in an area at least as extensive as they currently occupy* to maintain the population above recovery levels." (AR 29)(emphasis added).  In September 2002, the gray wolf population in Wyoming inhabited the Yellowstone and Grand Teton National Parks ("National Parks") and a limited area outside of the National Parks in northwestern Wyoming.

6

In November 2002, the Department submitted a draft version of a gray wolf management plan ("Draft Plan") to the FWS for comments. (AR 113-149). In the November 2002 Draft Plan, the Department proposed to manage gray wolves as "trophy game animals" in designated wilderness areas within the Shoshone and Bridger-Teton National Forests. (AR 123). The Department specifically stated that "Wyoming is not committing to maintain any specific number of packs." (AR 124). The November 2002 Draft Wyoming Plan did not define "pack." (AR 124).

On December 2, 2002, Ed Bangs, the Wolf Recovery Coordinator for Region 6, provided written comments on the November 2002 Draft Plan to the Department. (AR 38-52). Mr. Bangs congratulated the Department "on the quality of its biological assessment of wolves and what wolf management in Wyoming will require." (AR 38). He also stated that the November 2002 Draft Plan was "biologically sound." (AR 38). Despite these positive attributes, Mr. Bangs commented that "the [FWS] cannot concur that the wolf population will be conserved at a viable level by allowing wolves to be classified as predators and be taken without any regulation throughout the areas recommended" in the November 2002 Draft Plan. (AR 40).

On December 19, 2002, John Blankenship, the Deputy Regional Director for Region 6, clarified the Federal Defendants' position on the proposed predator classification, telling the Department that "based on what we know now about the dual status proposal, *this has the potential of working*, provided the area where wolves are classified as trophy game animals is of sufficient size to preclude relisting of the wolf once they are delisted. ... As described in your draft management plan, the size of the area is not large enough." (AR 75)(emphasis added).

In late January 2003, Wyoming Governor Dave Freudenthal asked Defendant Norton to tell the Wyoming Legislature, the Commission, and the Department exactly what changes needed to be made to the Wyoming statutes and the Draft Plan so that both satisfy the adequate regulatory mechanism requirement for delisting. (AR 256-257).

Also in late January 2003, United States Senator Craig Thomas, United States Senator Mike Enzi, and United States Representative Barbara Cubin (collectively referred to as "the Wyoming

Congressional Delegation") asked Defendant Norton to provide clear guidance to Wyoming regarding what changes needed to be made to the Wyoming statutes and the Draft Plan to satisfy the adequate regulatory mechanism requirement. (AR 245).

Defendant Williams responded to the Wyoming Congressional Delegation on behalf of Defendant Norton. (AR 246-247). He explained that the wolf management plan should include the following two fundamental elements:

> • Management authority to maintain the wolf population at or above recovery levels. Management authority is needed to provide protections for wolves beyond National Parks and National Forest wilderness areas and to allow flexibility to adapt protections to changing circumstances. The [FWS] has determined that the current draft legislative provisions [HB229] regarding management authorities and maintenance of 15 wolf packs in Wyoming (8 inside National Parks and 7 outside) should satisfy this requirement.

> • Monitoring to determine whether the wolf population is being maintained at or above recovery levels and to measure management results. Population information (including population size and mortality) is necessary to determine success and to adapt management to changing circumstances. The [FWS] has determined that the State's current draft legislative provisions [HB229] requiring monitoring and reporting should satisfy this requirement.

(AR 246)(emphasis added).

On February 21, 2003, Craig Manson, the Assistant Secretary for Fish and Wildlife and Parks, responded to Governor Freudenthal on behalf of Defendant Norton. (AR 254-255). Assistant Secretary Manson repeated verbatim comments that Defendant Williams made to the Wyoming Congressional Delegation regarding the management authority and monitoring provisions in HB229. (*Compare* AR 246 *with* AR 254).

In reliance on the representations from Defendant Williams and Assistant Secretary Manson, the Wyoming Legislature enacted HB229 to govern the management of gray wolves in Wyoming upon delisting. HB229 is codified as WYO. STAT. ANN. § 23-1-304. Section 23-1-304 provides that, upon delisting, the Department shall manage at least 15 wolf packs in Wyoming as a whole and at

8

least seven wolf packs living outside of the National Parks. WYO. STAT. ANN. § 23-1-304(b)(i).  Gray wolves shall be classified as "trophy game animals" in the National Parks and those federally designated wilderness areas contiguous to the National Parks and classified as "predatory animals" in all other areas of Wyoming.  WYO. STAT. ANN. § 23-1-304(b)(ii).  If there are less than seven wolf packs located in Wyoming and primarily outside of the National Parks, the Commission shall adopt rules and regulations to classify the gray wolf as a "trophy game animal" within that area of Wyoming the Commission determines is necessary to reasonably ensure that seven wolf packs are located in Wyoming and primarily outside of the National Parks.  WYO. STAT. ANN. § 23-1-304(b)(i)(A).  The Wyoming Legislature defined the term "pack" as five or more gray wolves traveling together.  WYO. STAT. ANN. § 23-1-304(c).

On May 5, 2003, two months after HB229 was enacted, Assistant Secretary Manson told the leadership of Wyoming Legislature that the Federal Defendants preferred that wolves be classified as trophy game statewide because "[w]e want to do as much as we can to ensure that a decision to delist wolves will be sustainable in the event of litigation and subsequent judicial scrutiny."  (AR 290)(emphasis added).

In June 2003, the Department submitted a revised version of the Draft Plan to the FWS for comments.  (AR 150-193).  Under the June 2003 Draft Plan, gray wolves would be classified as "trophy game animals" in the North Absaroka, Washakie, Teton, Jedediah Smith, Winegar Hole, and Gros Ventre Wilderness Areas and classified as predators in all other areas in Wyoming outside of the National Parks as long as there are seven packs outside the National Parks.  (AR 162).  The Department committed to maintaining a minimum of 15 packs within Wyoming with at least seven of the 15 packs located outside of the National Parks.  (AR 162).  The June 2003 Draft Plan did not define "pack."  (AR 164).

The June 2003 Draft Plan also established a management framework for addressing fluctuations in the number of wolf packs in Wyoming.  (AR 153, 162-163).  If the number of packs decreased below seven, the Commission would reclassify wolves from "predator" to "trophy game"

9

in a geographic area extending beyond the contiguous wilderness areas. (AR 153, 162-163). As soon as the number of packs recovered to seven or more packs, the Commission would again limit the geographic area in which wolves are classified as "trophy game." (AR 153, 162-163). At no time would the trophy game management area be smaller than the National Parks and the contiguous wilderness areas. (AR 153, 162-163).

In late June 2003, Paul Hoffman, Deputy Assistant Secretary for Fish and Wildlife and Parks, sent an e-mail to numerous Department employees to convey his comments on the June 2003 Draft Plan. With respect to what definition of "pack" should be used in the wolf management plan, Deputy Assistant Secretary Hoffman stated "[w]hy not use the legislated definition of 5 wolves and make your world more simple. I think we can live with that" and "I suggest you use the 5 wolves definition of the pack[.]" (AR 304-305)(emphasis added).

On July 2, 2003, Mr. Bangs provided the Department with written comments on the June 2003 Draft Plan. (AR 342-347). With respect to the classification of gray wolves as "predatory animals" in some areas in Wyoming, Mr. Bangs told the Department that "Interior Secretary Gale Norton has commented that she is also concerned about the use of the designation 'predator.'" (AR 343). He then urged Wyoming to reconsider the predator classification:

> [W]e believe [adopting the predator classification] was a very serious mistake that will continue to haunt our efforts to successfully delist wolves. Predatory animal status for wolves will make the whole delisting process much more contentious, emotional, expensive, and filled with hurtful rhetoric than necessary. The 'predator' issue alone could derail and will certainly prolong efforts to successfully delist wolves in the northwestern U.S., including Wyoming. No other states with wolves in the [m]idwest, southwest, or northwest has taken this position as it infers wolves should be eliminated and not maintained as a recovered population.
>
> * * *
>
> We believe that the image that under predatory animal status in Wyoming, wolves could be hunted and killed without a clear regulatory safety-net, at any time, without limit, and particularly-by any means-is unacceptable to most Americans. We believe those perceptions will cause unimaginable rhetoric, conflict, emotion and mistrust. It could raise millions of dollars and provide

a unifying justification for those groups who have most strongly supported wolf restoration, share animal fairness and humane concerns, but mistrust any type of state management-ie. the very organizations that are most likely to litigate over wolf delisting. While the [FWS] is mandated to focus on science and biology, *public attitudes and comments will influence subsequent litigation.* We urge you to reconsider the wisdom of 'predatory animal' status for wolves anywhere in Wyoming. *The Wyoming legislature could help avoid a huge and very public brawl that will be damaging, if not fatal, to the [FWS's] efforts to delist a recovered wolf population* and would greatly improve the National public's attitude and trust of Wyoming's abilities to manage wolves, by authorizing wolf trophy game status statewide. If wolves were listed as trophy game animals statewide, the [Department's] authority would be clear and their flexibility to utilize regulated hunting to minimize conflicts would be greatly increased. The controversial 'trigger' issue would be resolved. Hunters could help manage wolves outside of the area identified in the plan under a year-round, fair-chase, hunting season that would have the same biological effect as 'predatory animal' status.

* * *

*State-wide trophy game status would remove a major negative public relations perception* that will cloud the real issues that are being discussed during the delisting process.

(AR 347-348)(emphasis added).

With respect to the Department's management authority under the Wyoming Plan, Mr. Bangs commented:

> As the [FWS] has recommended, and the [Wyoming Plan] recognizes and provides for, Wyoming should commit to maintaining a minimum of at least 7 wolf packs in Wyoming outside of the National Parks, regardless of how many packs are inside the Yellowstone and Grand Teton National Parks. Wyoming should commit to maintaining 15 or more packs in Wyoming, so if wolf numbers in the Parks drop below 8 packs, Wyoming will have more than 7 packs outside the Parks. *The [Wyoming Plan] currently recognizes and provides for this.*

(AR 344)(emphasis added).

With respect to the definition of "pack," Mr. Bangs stated that, "[a]t this time, *it does not appear that the state definition of a pack under state law* (assumed to mean 5 wolves traveling

11

together in winter) *is going to be a major conflict with any new definition for a recovered wolf population.* ... State law may be inconsistent with the final determination of the post-delisting monitoring criteria but at this time *it does not appear any differences are biologically significant enough to jeopardize delisting.*"  (AR 345).

In July 2003, the Commission approved the final Wyoming Plan.  (AR 194-236).  In the final Wyoming Plan, the Department committed to maintaining a minimum of 15 packs within Wyoming and to maintaining seven of the 15 packs outside of the National Parks.  (AR 197, 206).  The Department also stated that it would apply the definition of "pack" in WYO. STAT. ANN. § 23-1-304(c).  (AR 209).  The final Wyoming Plan adopted a strategy for managing fluctuating wolf populations similar to the one outlined in the June 2003 Draft Plan.  If the number of wolf packs falls to seven or less outside of the National Parks, the Commission will immediately promulgate a rule to classify the gray wolf as a "trophy game animal" in a geographic area known as the Northwest Wyoming Wolf Data Analysis Unit ("Wolf DAU").  Wolves living in Wyoming outside of the Wolf DAU will be classified as "predatory animals."  (AR 197).

Under the Wyoming Plan, wolves will always be considered trophy game animals within the wilderness areas contiguous to the National Parks.  Including the National Parks where no take of wolves is permitted, this area will include over 4.5 million acres of wilderness habitat for wolves where only limited regulated take of wolves may occur.

The Wolf DAU will include the National Parks, the wilderness areas contiguous to the National Parks (Absaroka-Beartooth, North Absaroka, Washakie, Teton, Jedediah Smith, Winegar Hole, and Gros Ventre), and 2,642 square miles of land in Wyoming surrounding the National Parks and the contiguous wilderness areas.  (AR 197).  The Wolf DAU thus will permit only limited, regulated take of wolves in 9,780 square miles of land in Wyoming.

The Wolf DAU will consist of three wolf management units (or hunt areas).  (AR 197, 207).  The Department will manage for seven wolf packs within the Wolf DAU, and will use the wolf management units to regulate public take to achieve specific harvest objectives and insure recovery

objectives of the wolf population. (AR 207). The Wolf DAU/wolf management unit method for managing wolves is the same as the data analysis unit/hunt area method the Department uses to manage all other species of big game and trophy game animals. (AR 207).

The Department will actively monitor wolf populations and collect appropriate management data on wolves throughout Wyoming, including those areas where wolves are classified as "predatory animals." (AR 207). At least every 90 days, the Department shall provide the Commission with a monitoring report on the number of wolf packs within Wyoming and their general location. (AR 207). Based upon the monitoring report provided by the Department, the Commission will review the classification of wolves in the Wolf DAU to determine whether the boundaries of the Wolf DAU should be adjusted to maintain wolf pack management objectives. (AR 207).

The Commission will increase or decrease the geographic size of the Wolf DAU as needed to ensure that adequate regulatory mechanisms are in place to maintain seven wolf packs outside of the National Parks. (AR 207). As the geographic size of the Wolf DAU increases, the area in which wolves are classified as "trophy game animals" increases and the area in which wolves are classified as "predatory animals" decreases. (AR 207). An ability to increase the area of Wyoming where wolves are considered trophy game animals allows the Department to insure the sustainability of the wolf population. (AR 207).

### Peer Review of the Wyoming Plan

In late June 2003, Mr. Bangs began the process of selecting individuals to provide an independent peer review of the Wyoming Plan and the gray wolf management plans from Idaho ("Idaho Plan") and Montana ("Montana Plan"). (AR 335-336). In the letter sent to prospective peer review experts, Mr. Bangs explained the peer review process as follows:

> "The [FWS], itself, must first determine that [the Idaho Plan, the Montana Plan, and the Wyoming Plan] are likely to maintain a delisted wolf population above levels those [*sic*] that would cause a wolf population in the western DPS to become listed again under the Endangered Species Act. *If we believe that those plans could be adequate,* we will then forward them to a group of scientists that we select for independent professional peer

review.  *If that peer review determines that, in combination, those state laws will conserve a recovered wolf population then the [FWS] will develop a delisting proposal."*

(AR 335)(emphasis added).

Also in late June, Regional Director Morgenweck wrote a letter to the Predator Conservation Alliance in which he explained the peer review process for the state wolf management plans:

> "The [FWS], itself, must first determine that [the three state management plans] are likely to maintain a delisted wolf population above levels that would cause a wolf population in the [W]estern DPS to become listed again under the Endangered Species Act. *If we believe that those plans are adequate*, we will then forward them to a group of scientists, which we select, for independent professional peer review. *If that peer review determines that in combination those State laws will conserve a recovered wolf population throughout the [W]estern DPS, then the [FWS] will develop a delisting proposal.*"

(AR 308)(emphasis added).

In August 2003, Mr. Bangs confirmed that the peer review process would evaluate the three wolf management plans as a group, telling a newspaper reporter that:

> "[p]eer review is of all three plans as a group and *whether they as a group will conserve the wolf pop[ulation] in the [northern] Rocky Mountains.* ... He asked if state plans could be determined to not be good enough individually and I said [n]o, they are a group and if one wasn't colse [*sic*] enough to go to peer review or delisting than [*sic*] we won't proceed with any peer review or delisting proposal since the plans are judged as a group[.]"

(AR 387)(emphasis added).

On September 12, 2003, Mr. Bangs forwarded the three state management plans for independent scientific review by "12 of the top recognized wolf researchers, wolf management and livestock depredation experts in North America." (AR 400-405, 428). Mr. Bangs asked each of the peer review experts to provide their respective professional review and opinion as to whether each plan will achieve its stated objectives and whether the three plans collectively are adequate to maintain

the northern Rocky Mountain wolf population at or above recovery level into the foreseeable future. (AR 401).

By late November 2003, 11 of the 12 peer review experts had submitted their scientific reviews of the three state management plans.[2] The peer review experts made the following findings:

**Dr. Warren Ballard - Professor, Texas Tech University**: Dr. Ballard concluded that "the plans will meet the objectives of maintaining at least 30 packs equally distributed in each state" and that "each of the state's wolf management plans are adequate to maintain a viable population of wolves in the [Western DPS]." (AR 471).

**Rod Boertje - Biologist, Alaska Department of Fish and Game**: Mr. Boertje concluded the "Wyoming's plan for 15 packs, 7 outside the parks, to be adequate to achieve the [FWS's] plan for 10 breeding pairs" of wolves in Wyoming. (AR 449). He also determined that the state plans together are adequate to maintain at least 30 breeding pairs into the foreseeable future. (AR 451).

**Dr. Todd Fuller - Professor, University of Massachusetts**: Dr. Fuller concluded that the Wyoming Plan will fulfill Wyoming's portion of the population goals needed to concur with delisting criteria. (AR 481). He also determined that the three plans collectively will maintain, at a minimum, the wolf population at or above 30 breeding pairs that are equitably distributed between the three states. (AR 482).

**James Hammill - President, Iron Range Consulting & Services**: Although Mr. Hammill stated that, in his opinion, "Wyoming's plan exposes wolves in Wyoming to risk of catastrophic loss outside of National Parks and Parkway," he offered no specific opinion as to whether the Wyoming Plan will achieve its objectives. (AR 478). Despite his concerns about the Wyoming Plan, Mr. Hammill opined that "these plans provide enough protection and management foresight to provide a wolf population at or above 30 breeding pairs into the foreseeable future." (AR 479).

---

[2] Dr. Paul Paquet, a Canadian wolf/carnivore predatory prey expert, was the twelfth peer review expert selected by the Federal Defendants. (AR 430). For unknown reasons, Dr. Paquet did not submit a peer review critique on the three state management plans.

**Dr. Kyran Kunkel - Professor, Montana State University**: Dr. Kunkel determined that the Wyoming Plan may not achieve its stated objectives. (AR 460). In his opinion, if Wyoming changes its plan: (1) to make wolf trophy game animal in area encompassing existing packs; (2) to add a mechanism to respond to a decline in packs in YNP to below eight packs; and (3) to allow for trophy game classification to be extended beyond DAU if necessary, then " the Wyoming [P]lan should meet its and federal objective for wolf recovery." (AR 461). Dr. Kunkel further states that the three plans collectively are adequate to ensure wolf recovery into the foreseeable future if Wyoming makes his suggested changes to its plan. (AR 464).

**Mark McNay - Biologist, Alaska Department of Fish and Game**: Mr. McNay concluded that the Wyoming Plan should "adequately insure a minimum statewide population of at least 10 breeding pairs within the foreseeable future." (AR 456). He also determined that the three plans together are adequate to insure equitable distribution of 30 or more breeding pairs in Idaho, Montana, and Wyoming for the foreseeable future. (AR 457).

**Dr. L. David Mech - Senior. Research Scientist, U.S. Department of the Interior Geological Survey**: Dr. Mech concluded that the Wyoming Plan will achieve its objectives and that the three state plans together will maintain at least 30 or more breeding pairs into the foreseeable future. (AR 432). He determined that the classification of wolves as "predators" in some parts of Wyoming will not prevent Wyoming from maintaining a minimum of 15 wolf packs due to "fail-safe mechanism" of changing status of the wolf if the number of packs drops to seven packs. (AR 432-433).

**Bill Paul - Wolf Control/Depredation Expert, U.S. Department of Agriculture**: Mr. Paul determined that the Wyoming Plan will achieve its stated objectives and that the three plans collectively will maintain a recovered wolf population at or above 30 breeding pairs. (AR 435, 444).

**Dr. Rolf O. Peterson - Professor, Michigan Tech University**: Dr. Peterson concluded that the Wyoming Plan will maintain minimum numerical targets specified by FWS and that "collectively, these plans should maintain the wolf population at or above the recovery levels specified by the FWS,

16

although I have concerns regarding the Idaho plan that undermine that judgment." (AR 467, 469).

**Dr. Daniel Pletscher - Professor, University of Montana**: Dr. Pletscher concluded that the Wyoming Plan "probably will work," but he expressed concerns that managing for seven wolf packs outside of the National Parks is more difficult than managing for at least seven wolf packs outside of the National Parks and that predator status allows little management flexibility. (AR 465-466). With respect to his concerns about the predator status, Dr. Pletscher stated that "[t]his *probably* won't make a difference in maintaining the desired number of wolf packs in Wyoming[.]" (emphasis in original) (AR 466). His concerns about the Wyoming Plan notwithstanding, Dr. Pletscher opined that the three state plans collectively will maintain at least 30 breeding pairs of wolves distributed among Idaho, Montana, and Wyoming. (AR 466).

**Adrian Wydeven - Lead Wolf Biologist, Wisconsin Department of Natural Resources**: Mr. Wydeven concluded that "[t]here is reasonable assurance that 10 or more wolves [*sic*] would be maintained in Wyoming, but this is more due to the presence of Yellowstone National Park, and sound management plans by the 2 adjacent states." (AR 475). Despite his belief that the Wyoming Plan is "very rigid, narrow in scope, and lacks flexibility," he did not say that any of the weaknesses were fatal to the Wyoming Plan achieving its objectives. (AR 476). Mr. Wydeven also determined that the three state wolf management plans were adequate for maintaining 30 breeding packs in the Northern Rocky Mountains region. (AR 473).

In the final analysis, 10 of the 11 peer review experts (Dr. Ballard, Mr. Boertje, Dr. Fuller, Mr. Hammill, Mr. McNay, Dr. Mech, Mr. Paul, Dr. Peterson, Dr. Pletscher, Mr. Wydeven) determined that the three state plans collectively will conserve a recovered wolf population in the tri-state region. (AR 432, 435, 451, 466, 467, 471, 473, 479, 482). Although four peer review experts (Mr. Hammill, Dr. Kunkel, Dr. Pletscher, and Mr. Wydeven) express concerns about certain aspects of the Wyoming Plan, three of these experts still determined that the three state plans collectively will conserve a recovered wolf population in the tri-state region. (AR 460-461, 475-476, 478). Only Dr. Kunkel concluded that the three state management plans as written will not conserve a recovered wolf

17

population.  (AR 464).  He based his opinion on concerns about certain aspects of the Wyoming Plan.
(AR 460-462).  His concerns with the Wyoming Plan are different than the three concerns identified
by the Federal Defendants in rejecting the Wyoming Plan.  (*Compare* AR 461 *with* AR 512).

On November 26, 2003, Defendant Williams forwarded the peer review critiques to the
Department and asked the Department for comments.  (AR 428).  In explaining the peer review
process in the cover letter sent with the critiques, Defendant Williams told the Department that the
peer review experts "were asked the primary question — 'Collectively, will the three state wolf
management plans conserve a recovered wolf population should the Endangered Species Act
protections be removed?'"  (AR 428).  The Department submitted its comments on the peer review
critiques in early December 2003.  (AR 485-490).

## The Rejection of the Wyoming Plan

On January 13, 2004, Defendant Williams notified the Department that the Federal Defendants
had rejected the Wyoming Plan.  (AR 505-507).  Defendant Williams explained the reasons for
rejecting the Wyoming Plan as follows:

> Based on our review of state management plans, peer review comments, and
> the states' responses to those comments, the [FWS] is confident that both the
> Montana and Idaho wolf management plans are adequate to maintain their
> share of the tri-state wolf population above recovery levels.  Nonetheless, the
> [FWS] must consider the three state management plans in their totality
> because the wolf populations of the three states comprise the [Western DPS],
> the listed entity in question.  As a result, delisting cannot be proposed at this
> time due to some significant concerns about portions of Wyoming's state law
> and wolf management plan.  I have specifically outlined those concerns and
> provided recommendations to correct them in this letter.
>
> If Wyoming adequately addresses each of the following concerns, the [FWS]
> intends to proceed with the proposed delisting process for the gray wolf in the
> [Western DPS]:
>
> 1.    The 'predatory' animal status for wolves *must be changed.*  The
> unregulated harvest, inadequate monitoring plan, and unit boundaries
> proposed by the state's management plan do not provide sufficient

management controls to assure the [FWS] that the wolf population will remain above recovery levels. The designation of wolves as 'trophy game' statewide would allow Wyoming to devise a management strategy that provides for self-sustaining populations above recovery goals, regulated harvest and adequate monitoring of that harvest. As is the case with other trophy game in Wyoming, the state could establish management areas, season dates, and quota limits to control populations in a regulated manner. In addition, Wyoming could address wolf depredation concerns through regulations that exist for currently classified trophy game animals.

2. The Wyoming state law *must clearly commit to managing for at least 15 wolf packs in Wyoming.* We believe that wolf population management as trophy game would provide adequate controls to ensure that wolves remain above recovery goals with well distributed packs in suitable habitat.

3. The Wyoming definition of pack must be consistent among the three states and should be biologically based. As you are aware, the three states are currently collaborating on the criteria that defines a wolf pack. If a pack size must be established by law, rather than the result of this collaborative effort, *the state law must define pack size as at least 6 wolves traveling together in the winter.* At the current time, biological monitoring and analyses indicate that this pack size is expect to include at least one breeding pair.

(AR 505-506)(emphasis added).

The same day, the FWS issued a press release announcing that it had rejected the Wyoming Plan. (AR 512-513). The press release stated that "[t]he [FWS] said today the process to delist the western population of gray wolves can begin once Wyoming approves key changes to state law and its wolf management plan." (AR 512). The press release quoted Defendant Williams as saying that "'[d]elisting can move forward *as soon as Wyoming makes the changes we've identified* to both its state law and its wolf management plan, *but not until then* because these wolves are a part of one distinct population segment.'" (AR 512)(emphasis added).

On January 15, 2004, Deputy Assistant Secretary Hoffman appeared before the Joint Travel, Recreation, Wildlife, and Cultural Resources Interim Committee of the Wyoming Legislature to explain why the Federal Defendants rejected the Wyoming Plan. (Hoffman Transcr., at 3-4). Deputy

19

Assistant Secretary Hoffman explained the Federal Defendants' decision to reject the Wyoming Plan as follows:

"I'm here to tell you that we are very serious about proceeding with the process to delist wolves. It's required under the [ESA], but we need to do it in a way that will be sustained when the inevitable lawsuit is filed. I can't sit here and tell you under what circumstances we know we can win that lawsuit, but we all know, watching the recent decision regarding snowmobiles in Yellowstone, that it can be very hard to stand before a judge in Washington, D.C., and try and convince that judge that going from a threatened status to shoot-at-will constitutes adequate protection." (Hoffman Transcr., at 11).

\* \* \*

"Under the [ESA], our decisions are to be driven by science. Once the science part of the decision is concluded, then the proposed delisting undergoes legal analysis, because we know that if it's challenged in court, we will have to defend it." (Hoffman Transcr., at 15).

\* \* \*

"The issue of five or six animals is not resolved, but we know that the debate is narrowed to those two numbers." (Hoffman Transcr., at 29)

\* \* \*

"Our question is how are you going to sell [the predator classification] to an eastern judge?" (Hoffman Transcr., at 34).

\* \* \*

"Our legal analysis was based on litigation risk management principles and consultation with our solicitors; consultation with the secretary herself, who was formerly a solicitor for Fish & Parks and Interior and has a very good understanding of the [ESA]. Assistant Secretary [Manson] is probably one of the foremost experts on the [ESA]. And our analysis was based on – it's very much like the high probability of having a breeding pair, what we felt was the highest probability of having a delist rule sustained in a court challenge." (Hoffman Transcr., at 68-69).

\* \* \*

"Our analysis is based on the law and experience and cases and case law that's on the books and knowing – what we felt gave us the highest probability of having a decision at the conclusion of the process be sustainable." (Hoffman Transcr., at 69).

When the committee chairman summed up Deputy Assistant Secretary Hoffman's explanation by saying that "[i]t's perception and how a judge in the East will view it," Deputy Assistant Secretary Hoffman responded:

> Yes, Mr. Chairman, it all hinges on what we believe is our ability to defend a rule to delist wolves if a rule goes final.  It is based on our experience in these kinds of matters in litigation in the past. ...[T]he law says make decisions based on the science, but legal analysis is an appropriate overlay after the scientific analysis is done, *and from a strictly science perspective, yes, the plans were deemed adequate.  It's the legal considerations that prompt us to say no at this time*.

(Hoffman Transcr., at 35-36)(emphasis added).

## **STANDARD OF REVIEW**

Section 706(1) of the APA governs the judicial review of the First Cause of Action asserted in the FIRST AMENDED COMPLAINT.[3]  Section 706(1) dictates that a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. § 706(1).  "[A] claim under [Section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*, — U.S. —, 124 S.Ct. 2373, 2379 (2004)(emphasis in original).

Section 706(2) of the APA governs the judicial review of the Third and Sixth Causes of Action in the FIRST AMENDED COMPLAINT.  Administrative decisions involving the ESA are reviewed under the standards set forth in Section 706(2) of the APA. *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998).  In accordance with Section 706, the reviewing court shall hold

---

[3] Although the Second Cause of Action in the FIRST AMENDED COMPLAINT has been bifurcated and will be addressed in a separate proceeding, this Court ordered the parties to brief all jurisdictional issues involving any of the causes of action asserted in the FIRST AMENDED COMPLAINT in the initial round of briefing.  Wyoming has no idea what jurisdictional issues may be claimed by the Federal Defendants.  Until such time as those issues are raised by the Federal Defendants, it would be fruitless for Wyoming to speculate about defenses the Federal Defendants may or may not raise.

unlawful and set aside agency action found to be arbitrary, capricious, contrary to constitutional right, in excess of statutory limitations, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A)-(C).

An agency decision is arbitrary or capricious if: (i) the agency entirely failed to consider an important aspect of the issue; (ii) the agency's explanation for the decision was counter to the evidence before it; (iii) the agency relied on factors that Congress did not intend for it to consider; or (iv) the agency's decision is so implausible that it could not be attributed to the product of agency expertise. *Colorado Envt'l Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999). To satisfy the "arbitrary and capricious" standard, the agency must examine the relevant data and articulate a satisfactory explanation for its decision, including a rational connection between the facts found and the choice made. *Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012, 1035 (10th Cir. 2002).

To determine whether an agency's decision is arbitrary and capricious, the reviewing court must consider whether the agency based its decision on a consideration of relevant factors and whether the agency has committed a clear error of judgment. *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1029 (10th Cir. 2001). The agency's statement of reasons must inform the reviewing court and the public of the grounds of the decision and the essential facts upon which the decision was based. *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1035. The agency's decision must be upheld, if at all, on the basis articulated by the agency itself. *Pennaco Energy, Inc. v. United States Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004). The reviewing court cannot supply a reasoned basis for an agency decision that the agency itself has not given. *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1035. The reviewing court's inquiry "'must be searching and careful, but the ultimate standard of review is a narrow one.'" *Custer County Action Ass'n*, 256 F.3d at 1029, *quoting Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

The "arbitrary and capricious" standard also requires an agency's decision to be supported by the facts in the record. *Pennaco Energy, Inc.*, 377 F.3d at 1156. Regardless of whether the

agency's decision is classified as "formal" or "informal," a reviewing court must set aside the decision if the decision is not supported by substantial evidence in the administrative record. *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003)(citation & internal quotation omitted). "Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion." *Pennaco Energy, Inc.*, 377 F.3d at 1156 (citation & internal quotation omitted).

## SUMMARY OF THE ARGUMENT

The rejection of the Wyoming Plan is a "final agency action" subject to review under the citizens suit provision in the ESA and under Section 706(2) of the APA. The Federal Defendants acted arbitrarily, capriciously, and not in accordance with law in rejecting the Wyoming Plan because, in evaluating whether the Wyoming Plan satisfies the "adequate regulatory mechanisms" requirement in the ESA, they relied upon factors Congress did not intend for them to consider, namely litigation concerns and political considerations.

The Federal Defendants acted arbitrarily, capriciously, and not in accordance with law in rejecting the Wyoming Plan because the decision to reject the Wyoming Plan is contrary to the best scientific evidence in the administrative record. The findings of the peer review experts is the best (and only) scientific evidence in the administrative record, and 10 of the 11 peer reviewers determined that the Wyoming Plan, together with the wolf management plans from Idaho and Montana, provide an adequate regulatory mechanism to conserve the gray wolf population in the tri-state region.

The Federal Defendants acted arbitrarily, capriciously, and not in accordance with law in rejecting the Wyoming Plan because, with respect to the standard for evaluating the Wyoming Plan and the three stated reasons for rejecting the Wyoming Plan, they changed positions without explanation. The Federal Defendants changed the standard for evaluating the Wyoming Plan by rejecting the Wyoming Plan even though 10 of the 11 peer review experts concluded that the three state management plans together will conserve a recovered wolf population in the tri-state region.

23

The Federal Defendants also rejected the Wyoming Plan based upon three aspects of the Wyoming Plan after having approved of each these aspects before the Wyoming Plan was adopted.

The Federal Defendants acted arbitrarily, capriciously, and not in accordance with law in rejecting the Wyoming Plan because the decision to reject the Wyoming Plan is not supported by substantial evidence in the administrative record. The best (and only) scientific evidence in the administrative record shows that the Federal Defendants should have approved the Wyoming Plan.

The rejection of the Wyoming Plan also violates the Tenth Amendment to the United States Constitution. By making the delisting of the gray wolf in the Western DPS contingent upon Wyoming making the demanded changes to its state law, the Federal Defendants have illegally sought to compel Wyoming to enforce and enact a federal regulatory program.

Finally, the rejection of the Wyoming Plan constitutes agency action unlawfully withheld. The ESA requirements for evaluating the adequacy of existing regulatory mechanisms are discrete agency actions that the Federal Defendants are required by law to take. The scientific evidence in the administrative record shows that, as a matter of law, the Wyoming Plan should have been approved. The rejection of the Wyoming Plan thus constitutes agency action unlawfully withheld.

## ARGUMENT

**I.      The Federal Defendants acted arbitrarily, capriciously, and not in accordance with law in rejecting the Wyoming Plan.**

The Federal Defendants violated the non-discretionary mandates Section 1533 of the ESA and acted arbitrarily and capriciously in violation of the APA when they rejected the Wyoming Plan. Given that the APA governs judicial review of agency action challenged through the ESA citizen-suit provision, *see Gordon v. Norton*, 322 F.3d 1213, 1219 (10th Cir. 2003), the arbitrary and capricious standard of review governs both the Third and Sixth Causes of Action in the FIRST AMENDED COMPLAINT.

24

**A.      Statutory Requirements to Bring Suit under the ESA and APA**

Both the ESA and the APA have statutory requirements that must be satisfied before a court may review the legality of agency action. The ESA provides that "any person" may commence a civil suit on his own behalf against the Secretary where she allegedly has failed to perform any non-discretionary act or duty under 16 U.S.C. § 1533. *See* 16 U.S.C. § 1540(g)(1)(C). Written notice of the action must be given to the Secretary at least 60 days before commencing the action. 16 U.S.C. § 1540(g)(2)(C).

Wyoming is a "person" authorized to commence a civil suit under Section 1540(g)(1)(C), as the term "person" includes "any State." 16 U.S.C. § 1532(13). Wyoming has alleged that the Secretary has failed to perform a non-discretionary duty under Section 1533 when she based her decision to reject the Wyoming Plan on factors other than the best scientific data available to her, namely political concerns and fear of litigation by environmental groups. (1st Amend. Compl., ¶¶ 163-172). Wyoming also has provided timely written notice to the Secretary. (AR 538-542). Wyoming therefore has satisfied the statutory requirements for commencing a civil action under Section 1540(g)(1)(C).

To satisfy the statutory requirements for judicial review under the APA, a plaintiff must establish that the challenged agency action is a "final agency action." *Colorado Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000), *quoting* 5 U.S.C. § 704. Agency action is "final" for purposes of the APA if: (1) the impact of the action is direct and immediate; (2) the action marks the consummation of the agency's decisionmaking process; and (3) the action is one by which rights and obligations have been determined, or from which legal consequences flow. *Gordon*, 322 F.3d at 1220. The plaintiff has the burden of identifying specific federal conduct and explaining how it is "final agency action." *Colorado Farm Bureau Fed'n*, 220 F.3d at 1173. Whether an agency's action constitutes "final agency action" is a question of law. *Id.*

In this case, the "final agency action" is the rejection of the Wyoming Plan as explained in the January 13, 2004, letter from Defendant Williams to the Department.[4]  To satisfy the "direct and immediate impact" requirement, a plaintiff must show that it was directly affected by the agency action.  *Public Serv. Co. of Colo. v. United States Envtl. Protection Agency*, 225 F.3d 1144, 1147 (10th Cir. 2000).  The rejection of the Wyoming Plan directly affected Wyoming because, in rejecting the Wyoming Plan, the Federal Defendants presented Wyoming with a Hobson's choice — make the demanded changes or the gray wolf will not be delisted.  Wyoming thus was forced either to make the demanded changes or to seek legal redress for the illegal rejection of the Wyoming Plan.

The FWS's decision to reject the Wyoming Plan and to not proceed with delisting will have permanent and significant effects on Wyoming's other wildlife resources.  The exploding wolf population already has detrimentally affected Wyoming's ungulate species.  The continued predation of elk, deer, moose, and other ungulates by an unchecked wolf population directly and immediately harms Wyoming's ability to manage other wildlife species in that the Commission uses only license fees to manage both game and non-game species.

The rejection of the Wyoming Plan marked the consummation of the agency's decisionmaking process with respect to the Wyoming Plan as written.  An action marks the consummation of the decisionmaking process if it is neither tentative nor interlocutory in nature.  *Pennaco Energy, Inc.*, 377 F.3d at 1155.  In the January 13, 2004, letter, Defendant Williams stated that "[t]he 'predatory' animal status for wolves *must* be changed," "Wyoming state law *must* clearly commit to managing for at least 15 wolf packs in Wyoming," and that "state law *must* define pack size as at least 6 wolves traveling together in the winter."  (AR 505-506)(emphasis added).  He further stated that "[d]elisting

---

[4]  The fact that the Federal Defendants conveyed their decision to reject the Wyoming Plan in a letter to the Department has no bearing on whether the decision is a "final agency action" for purposes of the APA.  *See Natural Resources Defense Council, Inc. v. Envtl. Protection Agency*, 22 F.3d 1125, 1132 (D.C. Cir. 1994).  An agency cannot avoid judicial review by expressing its definitive position on an issue in a letter rather than in a more formal statement.  *Natural Resources Defense Council, Inc.*, 22 F.3d at 1132-1133.

can move forward *as soon as Wyoming makes the changes we've identified* to both its state law and its wolf management plan, *but not until then*." (AR 512)(emphasis added). These statements are not tentative or interlocutory in nature. By demanding that Wyoming change the Wyoming Plan and WYO. STAT. ANN. § 23-1-304, and by making the delisting of the gray wolf contingent upon those demanded changes, the Federal Defendants have taken the definitive, unequivocal position that the Wyoming Plan as written does not satisfy the adequate regulatory mechanisms requirement in the ESA. The January 13, 2004, letter thus marked the consummation of the Federal Defendants decisionmaking process with respect to the adequacy of the Wyoming Plan as written and whether to proceed with delisting the gray wolf in the Western DPS.

Finally, the rejection of the Wyoming Plan determined rights and obligations. The Federal Defendants stated categorically that Wyoming must change the Wyoming Plan and WYO. STAT. ANN. § 23-1-304, thereby imposing an obligation on Wyoming. Legal consequences also flowed from the rejection of the Wyoming Plan, as the Federal Defendants will not propose a rule to delist the gray wolf until Wyoming makes the demanded changes to the Wyoming Plan. This delay in the delisting of the gray wolf infringes upon Wyoming's sovereignty by preventing Wyoming from assuming management authority over the gray wolves living in Wyoming.

The January 13, 2004, letter conveys the Federal Defendants' unequivocal decision with respect to the adequacy of the Wyoming Plan as written and the decision to not proceed with delisting. The rejection of the Wyoming Plan directly and immediately determined obligations for Wyoming and caused legal consequences for Wyoming. The decision to reject the Wyoming Plan as explained in the January 13, 2004, letter therefore is a "final agency action" for purposes of the APA.

**B.      The Federal Defendants' Arbitrary and Capricious Actions**

The Federal Defendants acted arbitrarily, capriciously, and not in accordance with law in rejecting the Wyoming Plan because: (1) in evaluating the Wyoming Plan, they relied upon factors Congress did not intend for them to consider, namely political considerations and fear of litigation

by environmental groups; (2) the decision to reject the Wyoming Plan is contrary to the evidence before the agency; (3) with respect to the standard for evaluating the Wyoming Plan and the three stated reasons for rejecting the Wyoming Plan, the Federal Defendants changed positions without explanation; and (4) the decision to reject the Wyoming Plan is not supported by substantial scientific evidence in the administrative record.

**1.      Reliance on Factors Congress Did Not Intend to be Considered**

The Federal Defendants rejected the Wyoming Plan during a process of evaluating whether the gray wolf should be removed from the list of endangered or threatened species ("delisted") in the Western DPS. In making a delisting determination, the Secretary must evaluate whether the species is no longer endangered or threatened based upon five criteria, including the inadequacy of existing regulatory mechanisms. *See* 16 U.S.C. §§ 1533(a), (b), (c)(2)(B); 50 C.F.R. § 424.11(d). The Federal Defendants have determined that four of the delisting criteria are satisfied, with the "adequacy of existing regulatory mechanisms" requirement being the only criteria left to be satisfied before the gray wolf can be delisted in the Western DPS. The ESA dictates that any determination on the adequacy of existing regulatory mechanisms "shall" be made "solely on the basis of the best scientific and commercial data available to her." *See* 16 U.S.C. §§ 1533 (b), (c)(2)(B); 50 C.F.R. § 424.11(d).

The term "shall" imposes a mandatory duty upon the subject of the command. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1186 (10th Cir. 1999). The Secretary thus has a mandatory duty to evaluate the adequacy of existing regulatory mechanisms based solely upon the best scientific and commercial data available to her.

The term "solely" in 16 U.S.C. § 1533(b) limits the type of information the Secretary may rely upon in evaluating the adequacy of existing regulatory mechanisms. Congress added the term "solely" to 16 U.S.C. § 1533(b) in 1982 "to remove from the process of listing or delisting of species any factor not related to the biological status of the species." H.R. REP. NO. 97-567, at 20 (1982). The Secretary thus shall consider only biological information in evaluating the adequacy of existing

regulatory mechanisms and shall not consider any factors not related to the biological status of the species.

The administrative record contains no support for the rejection of the Wyoming Plan. In fact, the only information in the administrative record that deals with biological considerations are the peer reviews, of which 10 of 11 approve the Wyoming Plan as an adequate regulatory mechanism for conserving the tri-state wolf population.

The evidence in the administrative record shows that the Federal Defendants demanded the changes to the Wyoming Plan and WYO. STAT. ANN. § 23-1-304 based upon litigation concerns and political concerns. In his May 2003 letter to the leadership of the Wyoming Legislature, Assistant Secretary Manson explained that the FWS preferred that Wyoming classify wolves as trophy game animals statewide because "[w]e want to do as much as we can to ensure that a decision to delist wolves will be sustainable in the event of litigation and subsequent judicial scrutiny." (AR 290).

Mr. Bangs echoed these sentiments in his July 2, 2003, letter. In urging the Department to eliminate the predator classification in the Wyoming Plan, he stated that "[w]hile the [FWS] is mandated to focus on science and biology, public attitudes and comments will influence subsequent litigation" and that the predator classification "could raise millions of dollars and provide a unifying justification" for the conservation groups "most likely to litigate over wolf delisting." (AR 347-348).

On January 15, 2004, Deputy Assistant Secretary Hoffman confirmed that litigation concerns were the primary reason for rejecting the Wyoming Plan. (Hoffman Transcr., at 11, 15, 34-36, 68-69). In his testimony before the Joint Travel, Recreation, Wildlife, and Cultural Resources Interim Committee, Deputy Assistant Secretary Hoffman repeatedly explained that the Federal Defendants rejected the Wyoming Plan based upon a legal analysis of whether a delisting rule could be defended in court if Wyoming classified wolves as predators in parts of the state. (Hoffman Transcr., at 11, 15, 34-36, 68-69). Deputy Assistant Secretary Hoffman left no room for doubt about the true reason for rejecting the Wyoming Plan when he told the Committee that "*from a strictly science perspective,*

*yes, the plans were deemed adequate. It's the legal considerations that prompt us to say no at this time.*"[5] (Hoffman Transcr., at 35-360)(emphasis added).

Based on the foregoing evidence in the administrative record, this Court necessarily must find that the Federal Defendants relied upon litigation concerns as the reason for rejecting the Wyoming Plan. Such concerns are not related to the biological status of gray wolves in the Western DPS. By relying on such concerns, the Federal Defendants violated the non-discretionary "best science" mandate in Section 1533 and, as a result, the rejection of the Wyoming Plan was arbitrary and capricious.

In his July 2, 2003, letter, Mr. Bangs provided irrefutable evidence that the Federal Defendants also rejected the Wyoming Plan based upon political concerns. In this letter, Mr. Bangs provided his comments on the June 2003 Draft Plan. Mr. Bangs did not tell the Department that the predator classification was biologically unacceptable. Instead, he urged the Department to eliminate the predator classification because classifying wolves as predators would make the "delisting process much more contentious, emotional, expensive, and filled with hurtful rhetoric than necessary," was "unacceptable to most Americans," and would precipitate "a huge and very public brawl that will be

---

[5] Defendant Norton's position regarding the predator classification provides further proof that the Federal Defendants rejected the Wyoming Plan based on litigation concerns. In late February 2003, Defendant Norton advised Governor Freudenthal "that she was troubled by the use of the word predator" in HB229 and the draft Wyoming Plan. (AR 286). In June 2003, employees from Interior and the FWS described Defendant Norton as having "reacted pretty negatively" to Wyoming classifying the wolf as a "predatory animal" in some areas of the state and stated that she "was not on board" with Wyoming doing so. (AR 303). In July 2003, Mr. Bangs told the Department that Defendant Norton was "concerned" about the predator classification. (AR 343). Deputy Assistant Secretary Hoffman testified that Defendant Norton evaluated the Wyoming Plan based upon litigation risk management principles and in light of her prior experience as an attorney. (Hoffman Transcr., at 68-69). Given these facts, it is reasonable for this Court to infer that Defendant Norton's concerns about the predator classification were litigation concerns, not concerns about the biological effect of predatory status on the tri-state wolf population.

damaging, if not fatal" to delisting efforts, and it caused a "major negative public relations perception." (AR 347-348).

None of the concerns cited by Mr. Bangs are related to the biological status of the gray wolf. If the Federal Defendants truly believed that the predator classification was biologically unsound, Mr. Bangs would have said so in his comments. The fact that he did not do so shows that the Federal Defendants had no legitimate biological objections to the predator classification. Their only concerns about the predator classification had to do with politics and public perception of the term "predator," not biology.

Mr. Bangs' comments on the proposed initial trophy game management area provide further proof that the Federal Defendants had no legitimate biological objection to the predator classification. He commented that:

> "[a]ll Wilderness areas adjacent to Yellowstone and Grand Teton National Parks must be included in any initial wolf trophy game area designation. The [FWS] supports an area, at least as large as the one described in the state wolf plan, that would include Yellowstone National Park, Grand Teton National Park, the Parkway, and the North Absaroka, Washakie, Teton, Jedediah Smith, Winegar Hole, and Gros Ventre Wilderness areas."

(AR 345)(emphasis in original). If the Federal Defendants had legitimate biological objections to the predator classification, Mr. Bangs would not have expressly approved an *initial* trophy game management area and then defined the acceptable boundaries for the management area.

Mr. Bangs also confirmed that the predator classification is not biologically flawed when he told the Department that, if wolves were classified as trophy game statewide, hunters could help manage the wolf population in those areas where the Wyoming Plan initially classifies wolves as predators "under a year-round, fair-chase, hunting season that would have the same biological effect as 'predatory animal' status." (AR 347-348). If the predator classification were biologically unsound, Mr. Bangs would not have proposed an alternative form of management that has the same biological effect as the predator classification. Moreover, in making this statement, Mr. Bangs

31

effectively told the Department that Wyoming could manage gray wolves as predators even though legally they would be classified as "trophy game." This proposed *de facto* predator status for wolves shows that the Federal Defendants objected to the name "predator," not the biological consequences of classifying wolves as predators in parts of Wyoming.

Viewed together, the Federal Defendants stated concerns regarding public perception of the predator classification, the lack of evidence showing a legitimate biological problem with the predator classification, and the proposed *de facto* predator status permit only one reasonable conclusion — the Federal Defendants relied upon political concerns such as public perception as the reason for rejecting the Wyoming Plan. Such concerns are not related to the biological status of gray wolves in the Western DPS. By relying on such concerns as a reason for rejecting the Wyoming Plan, the Federal Defendants violated the non-discretionary "best science" mandate in Section 1533 and, as a result, their decision to reject the Wyoming Plan is arbitrary and capricious.

**2.      Decision Contrary to the Evidence Before the Agency**

In evaluating the adequacy of existing regulatory mechanisms, the Secretary shall base her evaluation solely upon the best scientific and commercial data available to her. *See* 16 U.S.C. §§ 1533 (a), (b), (c)(2)(B); 50 C.F.R. § 424.11(d). The Federal Defendants acted arbitrarily and capriciously in rejecting the Wyoming Plan because the decision to reject the Wyoming Plan is contrary to the best scientific evidence in the administrative record.

Congress did not define the phrase "best scientific and commercial data available" in the ESA and Interior has not defined the phrase in the implementing regulations for the ESA. Although no court has definitively interpreted the phrase "best scientific and commercial data available" as it is used in 16 U.S.C. § 1533, courts in other jurisdictions have provided some guidance for determining whether the Secretary has complied with the "best scientific and commercial data available" mandate.

The "best scientific and commercial data available" requirement was intended to ensure that the Secretary does not implement the ESA "haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997). The requirement also was intended to prevent agency

32

officials from zealously but unintelligently pursuing their environmental objectives. *Bennett*, 520 U.S. at 176-177.

The "best scientific and commercial data" mandate does not require the Secretary to conduct new, independent studies. *Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000). The Secretary must consider the best scientific data available, not the best scientific data possible. *Bldg. Indust. Ass'n of Superior, California v. Norton*, 247 F.3d 1241, 1246-1247 (D.C. Cir. 2001). The Secretary may not disregard superior data in evaluating the adequacy of existing regulatory mechanisms but, absent superior data, occasional imperfections in the data relied upon do not violate the "best scientific and commercial data" requirement. *See Bldg. Indust. Ass'n of Superior, California*, 247 F.3d at 1246-1247. Although the Secretary may make a decision on the adequacy of existing regulatory mechanisms based on less than conclusive scientific data, she cannot base her decision on no scientific evidence. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 847 (9th Cir. 2003).

To determine what is the best scientific evidence regarding the adequacy of the Wyoming Plan, this Court first must understand the procedure the Federal Defendants used to evaluate the adequacy of the three state wolf management plans. Upon receiving the state management plans, the Federal Defendants were to review the plans to determine whether the plans were adequate. (AR 308, 335, 387). The plans were to be forwarded to a panel of peer review experts *only if* the Federal Defendants determined that the plans may be adequate. (AR 308, 335, 387). If the peer review experts determined that the three plans collectively will conserve a recovered wolf population in the tri-state region, the Federal Defendants were to approve the plans and to proceed with the delisting of the gray wolf in the Western DPS. (AR 308, 335, 387).

The scope of the peer review process defines the relevant question to be answered regarding the adequacy of the three state plans. The Federal Defendants repeatedly stated that the three state management plans would be evaluated to determine whether the three plans as a group will conserve a recovered wolf population in the tri-state region. (AR 308, 335, 387, 428, 505). Although the

33

Federal Defendants asked the peer review experts to answer questions about each plan individually, the primary question posed to them was whether the three state management plans collectively will conserve a recovered wolf population in the tri-state region. (AR 428). Given these facts, the only relevant question regarding the adequacy of the three state management plans is whether the three plans as a group will conserve a recovered wolf population in the tri-state region.

The purpose of the peer review process defines what is the best scientific evidence in this administrative record. The Federal Defendants used peer review to ensure that their decisions are based upon scientifically sound data, assumptions, and analyses. (AR 836). Given this purpose, and given that the three plans should be evaluated as a group, the peer review experts' opinions regarding the adequacy of the three state management plans collectively to conserve a recovered wolf population in Idaho, Montana, and Wyoming thus constitute the best scientific evidence in the administrative record as to the biological soundness of the plans.

It is beyond dispute that 10 of the 11 peer review experts determined that the three state management plans collectively will conserve a recovered wolf population in Idaho, Montana, and Wyoming:

**Dr. Warren Ballard**: "I believe each of the state's wolf management plans are adequate to maintain a viable population of wolves in the [Western DPS]." (AR 471).

**Rod Boertje**: "I view the state plans adequate to collectively maintain at least 30 breeding pairs of wolves into the foreseeable future." (AR 451).

**Dr. Todd Fuller**: "The state plans will collectively maintain, at a minimum, the wolf population at or above 30 breeding pairs that are equitably distributed among Montana, Idaho, and Wyoming into the foreseeable future." (AR 482).

**James Hammill**: "I believe these plans provide enough protection and management foresight to provide a wolf population at or above 30 breeding pairs into the foreseeable future." (AR 479).

34

**Mark McNay**: "I believe the Wolf Conservation and Management Plans of Idaho, Montana, and Wyoming in combination are adequate to insure equitable distribution of 30 or more breeding pairs in Idaho, Montana, and Wyoming for the foreseeable future." (AR 457).

**Dr. L. David Mech**: "[The three state management plans collectively] should insure maintaining this wolf population at 30 or more breeding pairs for the foreseeable future." (AR 432).

**Bill Paul**: "I believe that the plans for the three states will collectively maintain a recovered wolf population at or above 30 breeding pairs of wolves." (AR 435).

**Dr. Rolf O. Peterson**: "I believe that, collectively, these plans should maintain the wolf population at or above the recovery levels specified by the FWS[.]" (AR 467).

**Dr. Daniel Pletscher**: "Despite my suggestions regarding how the Wyoming Plan could be improved, I believe that implementation of these plans would maintain at least 30 breeding pairs of wolves distributed among Idaho, Montana, and Wyoming." (AR 466).

**Adrian Wydeven**: "The 3 state wolf management plans seem to be adequate for maintaining 30 breeding packs in the Northern Rocky Mountains region." (AR 473).

Mr. Hammill, Dr. Pletscher, and Mr. Wydeven expressed concerns about specific aspects of the Wyoming Plan. (AR 460-461, 475-476, 478). Their concerns about specific aspects of the Wyoming Plan are irrelevant because, despite the concerns, Mr. Hammill, Dr. Pletscher, and Mr. Wydeven each determined that the three state management plans collectively will maintain a recovered wolf population in the tri-state region.[6]

Given that 10 of the 11 experts determined that the three state management plans together will conserve a recovered wolf population in the tri-state region, the Federal Defendants had no legitimate biological reason for rejecting the Wyoming Plan. To the contrary, the peer review findings dictate that the Wyoming Plan be approved, as the peer review findings are the best scientific

---

[6] Dr. Peterson expressed concerns about the adequacy of the Idaho Plan. (AR 467-469). Despite these concerns, the Federal Defendants did not reject the Idaho Plan.

35

evidence in the administrative record and the peer review findings establish that the three state management plans as written satisfy the "adequate regulatory mechanisms" requirement in the ESA. Deputy Assistant Secretary Hoffman  confirmed that the Wyoming Plan satisfies the "adequate regulatory mechanisms" requirement in the ESA when he told the Joint Travel, Recreation, Wildlife, and Cultural Resources Interim Committee that "from a strictly science perspective, yes, the plans were deemed adequate[.]" (Hoffman Transcr., at 35-36).

By ignoring the relevant peer review findings, the Federal Defendants disregarded the best scientific evidence available to them concerning the adequacy of the Wyoming Plan.  They did not explain why they disregarded the findings of the peer review experts and did not provide a scientifically-based explanation for rejecting the Wyoming Plan.  Absent such explanations, this Court necessarily must find that the reasons for rejecting the Wyoming Plan are contrary to the best scientific evidence in the administrative record and, as a result, the decision to reject the Wyoming Plan was arbitrary, capricious, and not in accordance with law.[7]

**3.      Change in Agency Position without Explanation**

An agency must adhere to its own pronouncements, or explain its departure from them. *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978).  A sudden and unexplained change in an agency's position is arbitrary and capricious. *Smiley v. Citibank*, 517 U.S. 735, 741-742 (1996).   The Federal Defendants arbitrarily and capriciously changed their position without explanation with respect to the standard for evaluating the three state management plans and with respect to each of the three stated reasons for rejecting the Wyoming Plan.

---

[7]  The Federal Defendants must provide a scientifically-based explanation for any decision regarding the adequacy of existing regulatory mechanisms. *See Am. Wildlands v. Norton*, 193 F.Supp.2d 244, 254-256 (D.D.C. 2002).  Without a scientifically-based explanation of the decision, the reviewing court must find that the decision is not based upon the best scientific and commercial data available and thus arbitrary and capricious. *See Am. Wildlands*, 193 F.Supp.2d at 256.

**a).**  **The Standard for Evaluating the State Management Plans**

Before and during the peer review process, the Federal Defendants repeatedly stated that the three state management plans would be evaluated as a group to determine whether the plans collectively will provide an adequate regulatory mechanism for conserving the northern Rocky Mountain wolf population.  (AR 308, 335, 387, 428, 505).

In the letter seeking recommendations for individuals to provide peer review critiques, Mr. Bangs explained that "[i]f ... peer review determines that, in combination, [the three state management plans] will conserve a recovered wolf population then the [FWS] will develop a delisting proposal."  (AR 335).  In explaining the peer review process to a reporter, Mr. Bangs stated that peer review would evaluate all three plans together as a group to determine whether as a group they will conserve the northern Rocky Mountain wolf population.  (AR 387).  Regional Director Morgenweck told a concerned conservation group that "[i]f ... peer review determines that in combination [the three state management plans] will conserve a recovered wolf population throughout the [W]estern DPS, then the [FWS] will develop a delisting proposal."  (AR 308).  During the peer review process, Defendant Williams told the Department that the peer reviewers were primarily asked whether the three state plans collectively will conserve a recovered wolf population should the Endangered Species Act protections be removed.  (AR 428).  In the January 13, 2004, letter rejecting the Wyoming Plan, Defendant Williams explained that the FWS "must consider the three state management plans in their totality because the wolf populations of the three states comprise the Western [DPS], the listed entity in question."  (AR 505).

Despite stating that the three state management plans must be considered together to determine whether as a group they will conserve the tri-state wolf population, the Federal Defendants rejected the Wyoming Plan as inadequate even though 10 of the 11 peer review experts determined that the three state management plans collectively will conserve a recovered wolf population in the tri-state region.  By ignoring these peer review findings, the Federal Defendants essentially changed the standard for evaluating the three state management plans without explanation.  Their failure to

37

explain the change in position regarding the standard for evaluating the three state management plans makes the decision to reject the Wyoming Plan arbitrary and capricious.

**b).     The Stated Reasons for Rejecting the Wyoming Plan**

**i).     Predator Classification**

Before the Wyoming Legislature enacted WYO. STAT. ANN. § 23-1-304 and the Commission approved the final Wyoming Plan, the Federal Defendants effectively approved of the predator classification. In September 2002, the Department asked Defendant Williams whether classifying wolves as predators in specific geographic areas in Wyoming would satisfy the "adequate regulatory mechanisms" requirement. (AR 32). Defendant Williams told the Department that "[w]olves will need *legal protection from unregulated human mortalities* under State law *in an area at least as extensive as they currently occupy* to maintain the population above recovery levels." (AR 29).

In making this statement, Defendant Williams basically told the Department that wolves would have to be classified as "trophy game" in an area at least as extensive as they occupied in September 2002 to satisfy the "adequate regulatory mechanisms" requirement. In September 2002, the gray wolf population in Wyoming inhabited an area in northwestern Wyoming which comprised less than one third of the total area of Wyoming. Had the predator classification been unacceptable, Defendant Williams should have told the Department that wolves needed to be protected from unregulated human mortalities throughout all of Wyoming. By telling the Department that wolves would have to be classified as "trophy game" in a defined geographic area, Defendant Williams effectively approved the use of the predator classification.

In his July 2, 2003, letter, Mr. Bangs told the Department that the initial trophy game management area must include all wilderness areas adjacent to both Yellowstone and Grand Teton National Parks. (AR 345). Had the predatory classification been unacceptable, Mr. Bangs should have told the Department that wolves needed to be classified as trophy game statewide. Instead, he expressly approved of an *initial* trophy game management area and identified specific boundaries for

38

the management that area. By expressly approving the geographically limited initial trophy game management area, Mr. Bangs effectively approved the use of the predator classification.

In addition, both Defendant Williams and Assistant Secretary Manson reviewed HB229 before passage and informed Governor Freudenthal that HB229 satisfied the "adequate regulatory mechanisms" requirement. (AR 246-247, 254-255). HB229 very clearly provided for a dual classification of wolves.

In his January 13, 2004, letter to the Department, Defendant Williams stated categorically that Wyoming could not have a predator classification for wolves. He did not explain why the Federal Defendants had rejected the predator classification after having approved of the classification in July 2003. Defendant Williams' failure to explain the change in position regarding the predator classification makes the decision to reject the Wyoming Plan arbitrary and capricious.

**ii).    Clear Commitment to Manage for 15 Packs**

Before the Wyoming Legislature enacted WYO. STAT. ANN. § 23-1-304 and the Commission approved the final Wyoming Plan, the Federal Defendants expressly approved of the wolf management authority set forth therein. In late February 2003, Assistant Secretary Manson told Governor Freudenthal and the Wyoming Congressional Delegation that the provisions in HB229 regarding management authorities and maintenance of 15 packs in Wyoming should satisfy the adequate regulatory mechanism requirement for delisting. (AR 246, 254). In early July 2003, Mr. Bangs acknowledged that the Wyoming Plan commits to maintaining at least 15 packs in Wyoming. (AR 344).

In his January 13, 2004, letter to the Department, Defendant Williams stated categorically that Wyoming must change its state law to clearly commit to managing for at least 15 wolf packs in Wyoming.[8] This demand contradicts the prior positions taken by Assistant Secretary Manson and

---

[8]  In making the demand that state law must clearly commit to managing for at least 15 wolf packs in Wyoming, Defendant Williams explained that "[w]e believe that wolf population management as trophy game would provide adequate controls to ensure that wolves remain above

Mr. Bangs. Defendant Williams did not explain why the Federal Defendants changed their position on the 15 pack issue. His failure to explain this change in position makes the decision to reject the Wyoming Plan arbitrary and capricious.

### iii).    Definition of "Pack"

Before the Commission approved the Wyoming Plan, the Federal Defendants told the Department the statutory definition of "pack" in WYO. STAT. ANN. § 23-1-304(c) was acceptable. In late June 2003, Assistant Secretary Hoffman told the Department to follow the definition of "pack" in WYO. STAT. ANN. § 23-1-304(c) in the Wyoming Plan. (AR 304-305). In early July 2003, Mr. Bangs told the Department that "[a]t this time, it does not appear that the state definition of a pack under state law (assumed to mean 5 wolves traveling together in winter) is going to be a major conflict with any new definition for a recovered wolf population. ... State law may be inconsistent with the final determination of the post-delisting monitoring criteria but at this time it does not appear any differences are biologically significant enough to jeopardize delisting." (AR 345).

In the January 13, 2004, letter rejecting the Wyoming Plan, Defendant Williams demanded that Wyoming law must define "pack" as at least six wolves traveling together in the winter because current biological monitoring and analyses indicated that this pack size is expected to include at least one breeding pair. (AR 506). This demand not only contradicts the positions taken by Assistant Secretary Hoffman and Mr. Bangs without explanation, it also changes the requirement for the number of breeding pairs Wyoming must maintain upon delisting.

By demanding that Wyoming change the definition of "pack," the Federal Defendants have increased the number of breeding pairs of wolves that Wyoming must maintain after delisting without

---

recovery goals with well distributed packs in suitable habitat." (AR 505-506). This explanation permits only one reasonable inference — that classifying wolves as trophy game animals statewide is the only way state law can clearly commit to managing for at least 15 wolf packs in Wyoming. The demand that state law must clearly commit to managing for at least 15 wolf packs thus is simply a demand for Wyoming to eliminate the predator classification.

explanation. The evidence in the administrative record shows that a pack with six or more wolves traveling together should have a breeding pair, while a pack of five wolves traveling together has an 80 percent chance of having a breeding pair. (AR 281). Given that the Federal Defendants have demanded that Wyoming manage wolves for a minimum of 15 packs, the demand that "pack" be defined as at least six wolves means that the Federal Defendants have demanded that Wyoming maintain at least 15 breeding pairs of wolves. To satisfy the recovery goals, Wyoming must maintain at least 10 breeding pairs of wolves after delisting.[9] (AR 199). The Federal Defendants have not explained why they have unilaterally increased the number of breeding pairs Wyoming must maintain after delisting. The failure to explain their change in position makes the rejection of the Wyoming Plan arbitrary and capricious.

**4.     Substantial Evidence**

The substantial evidence test imposes an affirmative duty upon the reviewing court to "consider conflicts in the record and to define, specifically, those facts which it deems supportive of the agency decision if that is the court's resolution of the matter." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994) (internal quotations and citation omitted). The reviewing court itself must examine the administrative record and itself must find and identify facts that support the agency's actions. *Olenhouse*, 42 F.3d at 1576.

The Federal Defendants cite no scientific evidence to support their stated reasons for rejecting the Wyoming Plan. Their reasons for rejecting the Wyoming Plan are contrary to the best scientific evidence in the administrative record, the findings of the peer review experts. This is more than just a case of the administrative record lacking substantial evidence to support the decision to reject the Wyoming Plan; the administrative record contains no evidence to support the decision. In fact, based upon the best scientific evidence in the administrative record, the Federal Defendants should have

---

[9] By defining a pack as five or more wolves traveling together in WYO. STAT. ANN. § 23-1-304 and by agreeing to manage for 15 packs, Wyoming will maintain 12 breeding pairs of wolves, two more breeding pairs than is required to satisfy the recovery criteria.

approved the Wyoming Plan.  Given the lack of substantial evidence to support their decision, the rejection of the Wyoming Plan was arbitrary and capricious.

**II.      The rejection of the Wyoming Plan violates the Tenth Amendment.**

The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the State, are reserved to the States respectively, or to the people." The Tenth Amendment precludes the Federal government from commandeering the legislative processes of a state by directly compelling the state to enact and enforce a federal regulatory program. *Kelley v. United States*, 69 F.3d 1503, 1509 (10th Cir. 1995), *citing New York v. United States*, 505 U.S. 144, 145 (1992).

The circumstances in this case are analogous to the situation faced by the State of New York in *New York v. United States*, 505 U.S. 144 (1992). In *New York*, the State of New York challenged the constitutionality of the Low-Level Radioactive Waste Policy Act ("Act"). *New York*, 505 U.S. at 152-154.  The Act provided three types of incentives to encourage states to provide for the disposal of low-level radioactive waste generated within their borders by requiring states to take specified steps by specified deadlines to develop a waste disposal facility. *New York*, 505 U.S. at 153. Any state that failed to comply with the required steps by the specified deadlines would be forced to forfeit money payments from a federally established escrow account ("forfeiture of money incentive"), to pay increased surcharges for access to existing disposal facilities, and, upon request of the generator or owner of such waste ("increased surcharge incentive"), to take title to the low-level radioactive waste and become liable for all damages the waste generators suffer as a result of the states' failure to do so promptly ("take incentive"). *New York*, 505 U.S. at 153-154.

The State of New York argued that the three incentives in the Act violated the Tenth Amendment and the Guarantee Clause in Article IV, §4 of the United States Constitution. *New York*, 505 U.S. at 154.  The Supreme Court held that the forfeiture of money and the increased surcharge

42

incentives were not inconsistent with the Tenth Amendment.[10] *New York*, 505 U.S. at 169-174.  The Supreme Court concluded that these incentives were constitutionally permissible exercises of Congress' authority to offer states a choice of regulating an activity according to federal standards or having state law preempted by federal law.  *Id.*

However, the Supreme Court held that the take incentive violated the Tenth Amendment. *New York*, 505 U.S. at 174-178.  The Court described the take incentive as offering state governments the "choice" of either accepting ownership of the waste and the legal responsibility for the generators' liability or regulating according to the instructions of Congress.  *New York*, 505 U.S. at 175.  The Court then concluded that the take incentive violated the Tenth Amendment because forcing the states to accept ownership of the waste and the legal responsibility for the generators' liability would commandeer state governments into the service of federal regulatory purposes, while the alterative of regulating pursuant to Congress' direction was a simple command to implement legislation enacted by Congress.  *New York*, 505 U.S. at 175-176.

The facts of this case are analogous to the facts in *New York*.  The Federal Defendants have offered Wyoming two choices – either (1) change Wyoming law to eliminate the predator classification for wolves, to commit to maintaining at least 15 packs by making wolves trophy game statewide, and to change the definition of "pack" to six or more wolves traveling together in winter, or (2) the gray wolf will not be delisted and Wyoming will continue to suffer harm to its wildlife resources and its ability to exercise its sovereign powers to manage wildlife in this state.

The threat to not delist gray wolves represents nothing more that an attempt to commandeer Wyoming to serve federal regulatory purposes, as Wyoming will continue to be forced to shoulder a substantial portion of the burden of wolf recovery in the western United States even though the ESA requires that the wolf be delisted.  Moreover, the Federal Defendants have acknowledged that

---

[10]  The Supreme Court also held that the forfeiture of money and the increased surcharge incentives did not violate the Guarantee Clause.   *New York*, 505 U.S. at 169-174, 185-186.

43

they do not have the money or the personnel to continue to manage wolves in Wyoming in the manner required by the ESA and its implementing regulations. (Hoffman Transcr., at 18-19). The impacts of wolf depredation resulting from the continued federal management of gray wolves in Wyoming will negatively impact big game populations in Wyoming and thereby adversely affect the Department's ability to generate revenue to manage other wildlife resources. Continued federal management of gray wolves also will force the Department to waste its scant resources to manage around the exploding wolf population in Wyoming. The Federal Defendants' attempt to commandeer Wyoming to serve federal regulatory purposes violates the Tenth Amendment.

The changes the Federal Defendants have demanded are simply a command for the Wyoming Legislature to implement the Federal Defendants' politically motivated interpretation of the "adequate regulatory mechanisms" requirement in the ESA. The reasons for demanding the changes to Wyoming law have nothing to do with the requirements of the ESA. The Federal Defendants have demanded the changes to mollify certain segments of the American public who find the predator classification to be politically unacceptable, regardless of the effect of predator status on the overall recovery of the wolf population. The Federal Defendants thus are using the "adequate regulatory mechanisms" requirement in the ESA as an excuse to force the Wyoming Legislature to enact wolf management guidelines that promote a federal political agenda unrelated to the legal requirements of the ESA. This arrant attempt to usurp the state legislative process to enact and enforce politically motived federal wolf management guidelines violates the Tenth Amendment.

## III.   By rejecting the Wyoming Plan, the Federal Defendants have unlawfully withheld agency action.

In addition to the Federal Defendants' rejection of the Wyoming Plan being arbitrary, capricious, and contrary to law, they unlawfully withheld agency action during process for reviewing the adequacy of the Wyoming Plan in violation of Section 706(1). To establish the right to relief under Section 706(1), a plaintiff must assert that an agency failed to take a discrete agency action that it is required to take. *Norton*, — U.S. —, 124 S.Ct. at 2379. The "discrete agency action" limitation

44

precludes broad programmatic attacks on agency actions. *Southern Utah Wilderness Alliance*, —
U.S. at —, 124 S.Ct. at 2379-2380. The phrase "discrete agency action" includes an agency order
which, for purposes of the APA, means "'a final disposition ... in a matter other than rulemaking.'"
*Norton*, — U.S. —, 124 S.Ct. at 2378, *quoting* 5 U.S.C. § 551(6). A "required agency action" is an
action demanded by statute or by agency regulations having the force of law. *Southern Utah
Wilderness Alliance*, — U.S. at —, 124 S.Ct. at 2380.

The ESA requires the Secretary to regularly review the status of listing species to determine
whether such species should be reclassified or delisted. 16 U.S.C. § 1533(c). In conducting this
review, the Secretary must evaluate the status of a species in light of the five criteria listed in 16
U.S.C. § 1533(a)(1), including the adequacy of existing regulatory mechanisms. *See* 16 U.S.C. §
1533(c)(2). The Secretary "shall" evaluate the adequacy of existing regulatory mechanisms "solely
on the basis of the best scientific and commercial data available to [her]." 16 U.S.C. §§
1533(b)(1)(A), (c)(2); 50 C.F.R. § 424.11(d).

The status review, the review of the existing regulatory mechanisms, and the manner in which
the Secretary evaluated the adequacy of the existing regulatory mechanisms all are required by the
ESA and necessarily require the Secretary to make a final disposition regarding the current status of
a listed species. These actions thus are discrete agency actions that the Federal Defendants were
required by law to take. Their failure to comply with the "best science" mandate when reviewing the
adequacy of the three state management plans amounts to agency action unlawfully withheld.

The administrative record supports the delisting of gray wolves under the ESA. The wolf
population is far beyond recovery objectives, and 10 of the 11 peer reviewers concluded that the
Wyoming Plan provides an adequate regulatory mechanism to conserve a recovered wolf population
in the tri-state area. The Federal Defendants' failure to commence delisting is agency action
unlawfully withheld.

45

## IV.    Remedy

Generally, if the administrative record does not support the agency action, the reviewing court should remand the matter to the agency for further proceedings. *Olenhouse*, 42 F.3d at 1575; *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1226 (10th Cir. 2002). In "rare circumstances," however, a reviewing court may remand a matter and dictate the outcome of the matter to the agency. *See Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1226; *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004). Such "rare circumstances" are present if: (1) the agency failed to provide a legally sufficient reason for rejecting evidence in the record; (2) there are no outstanding issues that must be resolved before a legal determination can be made; and (3) it is clear from the record that the agency would be required to make a specific legal determination if the rejected evidence were given credit instead. *Moisa*, 367 F.3d at 887.

This case presents the type of "rare circumstances" which warrant this Court ordering the Federal Defendants to approve the Wyoming Plan. The ESA required the Federal Defendants to evaluate the adequacy of the Wyoming Plan based solely on the best scientific information available. In rejecting the Wyoming Plan, the Federal Defendants ignored the best scientific evidence in the administrative record. The best (and only) scientific evidence in the administrative record is the peer review findings. The peer review findings show conclusively that the Wyoming Plan should have been approved, as 10 of the 11 peer reviewers concluded the Wyoming Plan satisfies the "adequate regulatory mechanisms" requirement in the ESA. Deputy Assistant Secretary Hoffman conceded that the three plans were deemed to be scientifically adequate. The Federal Defendants thus had no legitimate legal reason for disregarding the peer review findings and rejecting the Wyoming Plan.

There also are no outstanding issues to be resolved before making a determination regarding the adequacy of the Wyoming Plan. The Federal Defendants have completed the process for reviewing the three state management plans. The peer review of the three state management plans provide the best scientific evidence available regarding the adequacy of the plans. The Federal Defendants hand picked the peer review experts they now seek to ignore.

Finally, given that the peer review findings constitute the best scientific evidence available regarding the adequacy of the Wyoming Plan, it is clear from the record and the requirements of Section 1533 that the Federal Defendants would be required to approve the Wyoming Plan if they gave the proper weight to the peer review findings. Accordingly, this Court should remand this matter to the Federal Defendants with directions to approve the Wyoming Plan and to propose a rule to delist the gray wolf in the Western DPS no later than two months after the date of the Court's order and judgment.

If this Court elects not to direct the Federal Defendants to approve the Wyoming Plan, this Court should specifically hold that the peer review findings on the question of whether the three state management plans collectively will conserve the tristate wolf population is the "best science" regarding the adequacy of the Wyoming Plan and remand this matter to the agency with directions for the agency to adhere to  the "best science" mandate in Section 1533 when reevaluating the Wyoming Plan. This Court should further order the Federal Defendants to complete the reevaluation of the Wyoming Plan no later than two weeks after the date of this Court's order. In addition, given the political nature of the decision to reject the Wyoming Plan, this Court should specifically retain jurisdiction over this matter during the remand to ensure that the Federal Defendants comply with this Court's directions on remand and with the legal requirements of the ESA.

**[Intentionally Left Blank]**

47

**CONCLUSION**

For the foregoing reasons, Wyoming respectfully requests that this Court set aside the Federal Defendants' decision to reject the Wyoming Plan and remand this matter to the Federal Defendants with directions to approve the Wyoming Plan and to propose a rule to delist the gray wolf in the Western DPS no later than two months after the date of the Court's order and judgment.  In the alternative, Wyoming respectfully requests that this Court remand this matter to the agency with directions for the agency to adhere to the "best science" mandate in Section 1533 when reevaluating the Wyoming Plan and to complete the reevaluation of the Wyoming Plan no later than two weeks after the date of this Court's order.  In addition, Wyoming requests that this Court specifically retain jurisdiction over this matter during the remand to ensure that the Federal Defendants comply with this Court's directions on remand and with the legal requirements of the ESA.

Respectfully submitted this 27th day of November, 2004.

Patrick J. Crank
Attorney General

Jennifer A. Golden
Deputy Attorney General

Jay Jerde
Senior Assistant Attorney General

Thomas W. Rumpke
Senior Assistant Attorney General

48

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of **Appellant State of Wyoming's Opening Brief** was served on the 29ᵗʰ day of November, 2004, addressed correctly as follows and by the method indicated below:

Kristen L. Gustafson
Jimmy Rodriquez
U. S. Department of Justice
Environmental and Natural Resources
601 D Street NW, Rm 3032
Washington, DC 20044-7369
(via Federal Express, postage prepaid)

Carol Statkus
U.S. Attorney's Office
P O Box 668
Cheyenne, WY 82003
(via U.S. Mail, postage prepaid)

Bryan A. Skoric
James F. Davis
1002 Sheridan Ave
Cody, WY 82414
(via U.S. Mail, postage prepaid)

Thomas M. France
National Wildlife Federation
240 N. Higgins, Ste 2
Missoula, MT 59802
(via U.S. Mail, postage prepaid)

Thomas F. Darin
P O Box 2728
Jackson, WY 83001
(via U.S. Mail, postage prepaid)

Harriet M. Hageman
Hageman & Brighton
1822 Warren Ave
Cheyenne, WY 82001
(via U.S. Mail, postage prepaid)

Jack Tuholske
Tuholske Law Office
P O Box 7458
Missoula, MT 59897
(via U.S. Mail, postage prepaid)

*Kari N. Rayment*
Wyoming Attorney General's Office

49

Appendix A

Case 2:04-cv-00123-ABJ   Document 64   Filed 11/29/04   Page 56 of 66

**Wyoming Administrative Procedure Act.** — See § 16-3-101(a), (b)(xi).

**Severability.** — Law 1939, ch. 65, § 94, provides: "If any clause, sentence, paragraph, subdivision, section or part of this act be adjudged unconstitutional or invalid, such judgment shall not affect, impair, or invalidate any other part hereof, but judgment shall be confined in its operation to such clause, sentence, paragraph, subdivision, section, or part thereof directly involved in the controversy in which said judgment shall have been rendered."

**Repealing clauses.** — Laws 1939, ch. 65, § 95, provided that all acts and parts of acts in conflict herewith are hereby repealed.

## § 23-1-304. Classification of gray wolves.

(a)  The commission shall determine the classification of gray wolves as provided in this section. In making this classification the commission shall rely upon information provided by department personnel and shall consult with the Wyoming animal damage management board created by W.S. 11-6-303 and the director of the Wyoming department of agriculture, and consider any additional information provided by that board and by that director.

(b)  The department shall provide to the commission at least a quarterly monitoring report on the number of gray wolf packs within this state and their general location. Within thirty (30) days of receiving a department report the commission shall at a public meeting:

(i)  Determine if there are less than seven (7) packs of gray wolves located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway and less than fifteen (15) packs within this state, including Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway. If such a determination is made:

(A)  The commission shall adopt rules and regulations to classify the gray wolf as a trophy game animal and prohibit the taking of gray wolves except as provided by W.S. 23-3-115(c), within that area of the state the commission determines is necessary to reasonably ensure seven (7) packs of gray wolves are located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway at the end of the current calendar year;

(B)  At any time that gray wolves are classified as trophy game animals outside of any area specified in W.S. 23-1-101(a)(xii)(B)(I), the commission shall:

(I)  Meet in public not less than once every ninety (90) days to review the classification and determine the need for its continuance;

(II)  In consultation with the director of the Wyoming department of agriculture, upon receipt of information from the department of agriculture, consider the reclassification of wolves in all or a portion of such area at the commission's next scheduled meeting, or at an earlier meeting of the commission as the commission deems desirable or necessary.

(ii)  Maintain the classification of gray wolves as a predatory animal and trophy game animal as specified in W.S. 23-1-101(a)(viii) and (xii)(B)(I), if it determines there were at least seven (7) packs of gray wolves located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway or at least fifteen (15) packs within this state, including Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway as of the end of the preceding calendar quarter.

(c)  For purposes of this section "pack" means five (5) or more gray wolves traveling together. If a group of gray wolves consists of more than ten (10) animals known to be traveling together, the commission may, at its discretion, recognize the number of packs within such a group to be equal to the number of reproductively mature females bearing young found within that group of wolves.

(d)  The department shall institute and maintain an active program of population monitoring statewide. In all areas of the state, except where otherwise provided, any person who harvests a wolf shall notify the department where the harvest occurred within ten (10) days. Any information regarding the number or nature of wolves legally harvested within the state of Wyoming shall only be released in its aggregate form and no information of a private or confidential nature shall be released without the written consent of the person to whom the information may refer. Information identifying any person legally harvesting a wolf within this state is solely for the use of the department or appropriate law enforcement offices and is not a public record for purposes of W.S. 16-4-201 through 16-4-205.

(e)  The department shall actively monitor big game animal herd populations statewide to determine whether and to what extent the gray wolf is negatively impacting big game animal herds, and thereby hunting opportunities. To the extent permitted by this title, the department shall manage the gray wolf population as necessary to ensure the long-term health and viability of any big game animal herd that is being threatened in this state.

(f)  This section shall apply from and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108. (Laws 2003, ch. 115, § 1.)

**Prospective operation** — Laws 2003, ch. 115, § 3, directs that nothing in the act is to prohibit the ownership of a wolf hybrid if the animal was owned before the effective date of the act by a person then residing in the state.

**Legislative intent** — Laws 2003, ch. 115, § 4, provides:

"(a) It is the purpose of this act, unless the introduction of the gray wolf into Wyoming is determined by lawful authorities not to have been in accordance with federal law, to provide appropriate state management and control of gray wolves in order to facilitate the removal of the gray wolf from its listing as an experimental nonessential population, endangered species or threatened species in Wyoming and to prevent future listing of the gray wolf as an experimental nonessential population, endangered species or threatened species.

"(b) In providing appropriate state management and control of gray wolves, the state acknowledges the need to fill the current vacuum of management of this species within the state. The state retains all rights to investigate and, if determined by state officials to be appropriate, take legal actions against the federal government relating to the introduction of the gray wolf into the boundaries of this state.

"(c) In order to accomplish the purposes of this act, the game and fish commission shall enter into a memorandum of understanding with appropriate federal agencies under which the commission and federal agencies shall endeavor to manage the prey base for gray wolves in a manner to maintain a sufficient prey base in Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway within the state for at least eight (8) packs of wolves. The game and fish commission shall endeavor to manage big game populations providing a prey base for seven (7) packs of gray wolves in all other areas of the state in such a manner as to mitigate to the greatest extent possible, adverse effects on opportunities for licensed hunters to take big game.

"(d) The game and fish commission shall report to the joint travel, recreation, wildlife and cultural resources interim committee not later than September 1, 2003, regarding the implementation of this act."

**Effective dates.** — Laws 2003, ch. 115, § 5, makes the act effective immediately upon the completion of all acts necessary for a bill to become law as provided by art. 4, § 8, Wyo. Const. Approved March 4, 2003.

# ARTICLE 4. CREATION AND ORGANIZATION OF THE GAME AND FISH DEPARTMENT

**Am. Jur. 2d, ALR and C.J.S. references.** — 35A Am. Jur. 2d Fish and Game §§ 41, 44.

36A C.J.S. Fish § 37; 38 C.J.S. Game § 50.

## § 23-1-401.  Game and fish department; creation; control.

(a)  The Wyoming game and fish department is created.

(b)  The department is under the direction and supervision of the commission.

(c)  The department consists of the director who is the chief administrative officer and such divisions as the commission may create. (Laws 1973, ch. 249, § 1; W.S. 1957, § 23.1-12.)

**Stated** in O'Brien v. State, 711 P.2d 1144 (Wyo. 1986).

## § 23-1-402.  Game and fish director; appointment; salary; term of office; qualification; duties and authority.

(a)  The governor shall appoint a competent person as the director of the department as provided in W.S. 9-2-2010 at a salary determined by the commission, not to exceed the sum set by law.

(b)  The director shall hold office at the pleasure of the governor and may be removed by him as provided in W.S. 9-1-202.

# APPENDIX B

| | |
|---|---|
| (xxxiii)(xxxiv)   Resident license to capture falcons for falconry purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25.00 |
| (xxxiv)(xxxv)   Nonresident license to capture falcons for falconry purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170.00 |
| (xxxv)(xxxvi)   License to hunt with falcon; game birds, small game animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.00 |
| (xxxvi)(xxxvii)   Special bird license (use on game bird farms only) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.00 |
| (xxxvii)(xxxviii)   Resident turkey license . . . . . . . . . . . . . | 10.00 |
| (xxxviii)(xxxix)   Nonresident turkey license . . . . . . . . . . | 50.00 |
| (xxxix)(xl)   Wyoming interstate game tag . . . . . . . . . . . | 3.00 |
| (xl)(xli)   Resident game bird license; all game birds except turkey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.00 |
| (xli)(xlii)   Resident small game license . . . . . . . . . . . . . . | 10.00 |

**Section 2.**  This act is effective January 1, 2004.

Approved March 4, 2003.

## Chapter 115

### PREDATOR AND TROPHY GAME MANAGEMENT

Original House Bill No. 229

AN ACT relating to wildlife; providing for the reclassification, harvesting and other regulation of gray wolves as trophy game animals as specified; monitoring gray wolves; providing for the regulation of wolf hybrids; providing a definition of livestock for purposes of the game and fish provisions; providing for meetings and for rulemaking; prohibiting the private ownership of wolves and wolf hybrids; providing a statement of legislative intent; providing for implementation and reports; making conforming amendments; and providing for an effective date.

*Be It Enacted by the Legislature of the State of Wyoming:*

**Section 1.**  W.S. 23-1-108 and 23-1-304 are created to read:

**23-1-108.  Delisting of gray wolves as experimental, nonessential population, endangered species or threatened species.**

Gray wolves shall be deemed removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming upon final publication in the Federal Register by appropriate federal agencies removing the gray wolf from all listings as an experimental nonessential population, endangered species or threatened species in Wyoming.

### 23-1-304.  Classification of gray wolves.

(a)  The commission shall determine the classification of gray wolves as provided in this section. In making this classification the commission shall rely upon information provided by department personnel and shall consult with the Wyoming animal damage management board created by W.S. 11-6-303 and the director of the Wyoming department of agriculture, and consider any additional information provided by that board and by that director.

(b)  The department shall provide to the commission at least a quarterly monitoring report on the number of gray wolf packs within this state and their general location. Within thirty (30) days of receiving a department report the commission shall at a public meeting:

(i)  Determine if there are less than seven (7) packs of gray wolves located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway and less than fifteen (15) packs within this state, including Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway. If such a determination is made:

(A)  The commission shall adopt rules and regulations to classify the gray wolf as a trophy game animal and prohibit the taking of gray wolves except as provided by W.S. 23-3-115(c), within that area of the state the commission determines is necessary to reasonably ensure seven (7) packs of gray wolves are located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway at the end of the current calendar year;

(B)  At any time that gray wolves are classified as trophy game animals outside of any area specified in W.S. 23-1-101(a)(xii)(B)(I), the commission shall:

(I)  Meet in public not less than once every ninety (90) days to review the classification and determine the need for its continuance;

(II)  In consultation with the director of the Wyoming department of agriculture, upon receipt of information from the department of agriculture, consider the reclassification of wolves in all or a portion of such area at the commission's next scheduled meeting, or at an earlier meeting of the commission as the commission deems desirable or necessary.

(ii)  Maintain the classification of gray wolves as a predatory animal and trophy game animal as specified in W.S. 23-1-101(a)(viii) and (xii)(B)(I), if it determines there were at least seven (7) packs of gray wolves located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway or at least fifteen (15) packs within this state, including Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway as of the end of the preceding calendar quarter.

(c)   For purposes of this section "pack" means five (5) or more gray wolves traveling together.  If a group of gray wolves consists of more than ten (10) animals known to be traveling together, the commission may, at its discretion, recognize the number of packs within such a group to be equal to the number of reproductively mature females bearing young found within that group of wolves.

(d)   The department shall institute and maintain an active program of population monitoring statewide.  In all areas of the state, except where otherwise provided, any person who harvests a wolf shall notify the department where the harvest occurred within ten (10) days.  Any information regarding the number or nature of wolves legally harvested within the state of Wyoming shall only be released in its aggregate form and no information of a private or confidential nature shall be released without the written consent of the person to whom the information may refer.   Information identifying any person legally harvesting a wolf within this state is solely for the use of the department or appropriate law enforcement offices and is not a public record for purposes of W.S. 16-4-201 through 16-4-205.

(e)   The department shall actively monitor big game animal herd populations statewide to determine whether and to what extent the gray wolf is negatively impacting big game animal herds, and thereby hunting opportunities.  To the extent permitted by this title, the department shall manage the gray wolf population as necessary to ensure the long-term health and viability of any big game animal herd that is being threatened in this state.

(f)   This section shall apply from and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108.

**Section 2.**   W.S. 11-6-302(a)(ix) and (x), 23-1-101(a)(viii) and (xii), 23-1-102(a) by creating a new paragraph (xvi), 23-1-103, 23-1-302(a) by creating a new paragraph (xxix), 23-2-101(j) by creating a new paragraph (xlii), 23-2-104(e), 23-2-303(d), 23-3-102(b), 23-3-115 by creating a new subsection (c), 23-3-301 and 23-3-304(a) are amended to read:

**11-6-302.   Definitions.**

(a)   As used in this article:

(ix)   "Predatory animal" means:

(A)   Coyote, jackrabbit, porcupine, raccoon, red fox, skunk, wolf or stray cat; and

(B)   Until the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108, "predatory animal" includes wolves. After that date, "predatory animal" shall include any gray wolf not within an area of the state in which the gray wolf is:

(I)   Designated as a trophy game animal under subdivision (x)(B)(I) of this subsection; or

(II)   Classified as a trophy game animal by the game and fish commission pursuant to W.S. 23-1-304(b)(i)(A).

(x)   "Trophy game animal" means:

(A)   Black bear, grizzly bear or mountain lion; and

(B)   From and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108:

(I)   "Trophy game animal" shall include any gray wolf within those tracts of land within the boundaries of Wyoming designated as Yellowstone National Park, Grand Teton National Park, the John D. Rockefeller, Jr. Memorial Parkway, and those federally designated wilderness areas contiguous to these national parks and this parkway as defined by the United States congress as of January 1, 2003; and

(II)   "Trophy game animal" shall include any gray wolf within any area of the state where gray wolves are classified as trophy game animals by the game and fish commission pursuant to W.S. 23-1-304(b)(i)(A).

## 23-1-101.  Definitions of wildlife.

(a)   As used in this act:

(viii)   "Predatory animal" means:

(A)   Coyote, jackrabbit, porcupine, raccoon, red fox, ~~wolf,~~ skunk or stray cat; and

(B)   Until the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108, "predatory animal" includes wolves.  After that date, "predatory animal" shall include any gray wolf not within an area of the state in which the gray wolf is:

(I)   Designated as a trophy game animal under subdivision (xii)(B)(I) of this subsection;

(II)   Classified as a trophy game animal by the commission pursuant to W.S. 23-1-304(b)(i)(A).

(xii)   "Trophy game animal" means:

(A)   Black bear, grizzly bear or mountain lion; and

(B)   From and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108:

(I)   "Trophy game animal" shall include any gray wolf within those tracts of land within the boundaries of Wyoming designated as Yellowstone National Park, Grand Teton National Park, the John D. Rockefeller, Jr. Memorial Parkway, and those federally designated wilderness areas contiguous to these national parks and this parkway as defined by the United States congress as of January 1, 2003; and

(II) "Trophy game animal" shall include any gray wolf within any area of the state where gray wolves are classified as trophy game animals by the commission pursuant to W.S. 23-1-304(b)(i)(A).

**23-1-102. General definitions.**

(a) As used in this act:

(xvi) "Livestock" means horses, mules and asses, rabbits, llamas, cattle, swine, sheep, goats, poultry, or other animal generally used for food or in the production of food or fiber, and guard animals actively engaged in the protection of livestock. Bison are considered livestock unless otherwise designated by the Wyoming livestock board and the commission.

**23-1-103. Ownership of wildlife; purpose of provisions.**

For the purpose of this act, all wildlife in Wyoming is the property of the state. It is the purpose of this act and the policy of the state to provide an adequate and flexible system for control, propagation, management, protection and regulation of all Wyoming wildlife. There shall be no private ownership of live animals classified in this act as big or trophy game animals or of any wolf or wolf hybrid.

**23-1-302. Powers and duties.**

(a) The commission is directed and empowered:

(xxix) After the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108, to classify gray wolves as predatory or trophy game animals in accordance with W.S. 23-1-304, and to regulate the number of gray wolves which may be taken under a license issued under this act.

**23-2-101. Fees; restrictions; nonresident application fee; nonresident licenses; verification of residency required.**

(j) Subject to W.S. 23-2-101(f), the following hunting licenses and tags may be purchased for the fee indicated and subject to the limitations provided:

(xlii) From and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108:

    (A) Resident gray wolf license . . . . . . . . . . . . . . . . . . . $15.00

    (B) Nonresident gray wolf license . . . . . . . . . . . . . . . . $150.00

**23-2-104. Archery licenses; special seasons; prohibition against firearms; equipment.**

(e) When hunting antelope, bighorn sheep, black bear, deer, mountain goat or mountain lion the longbow hunter must be equipped with a longbow of not less than forty (40) pounds draw weight or possessing the ability to cast a hunting arrow of four hundred (400) grain weight at least one hundred sixty (160) yards. When hunting elk, grizzly bear or moose, the longbow hunter must be equipped with a longbow of not less

than fifty (50) pounds draw weight or possessing the ability to cast a hunting arrow of five hundred (500) grain weight at least one hundred sixty (160) yards. The crossbow hunter must be equipped with a crossbow of not less than ninety (90) pounds draw weight which has a minimum draw length of fourteen (14) inches (from front of bow to back of string in the cocked position), a positive safety mechanism, and, except as provided in subsection (f) of this section,  which must be cocked by hand without the aid of leverage-gaining devices. Crossbow bolts must be at least sixteen (16) inches long. The broadhead of arrows or bolts shall be of sharp steel with a minimum cutting width of one (1) inch. The provisions of this subsection relating to the hunting of antelope, bighorn sheep, black bear, deer, mountain goat and mountain lion shall also apply to the hunting of the gray wolf as a trophy game animal from and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108.

**23-2-303.   Trapping licenses; tagging; traps and snares; penalty; confiscation.**

(d)   All traps and snares used for furbearing or predatory animals shall be permanently marked or tagged with the name and address of the owner or the identification number assigned to the owner by the department. Any identification number attached to a trap or snare pursuant to this subsection is solely for the use of the department or appropriate law enforcement officers and is not a public record for purposes of W.S. 16-4-201 through 16-4-205. No trap or snare shall be set for furbearing or predatory animals within thirty (30) feet of any exposed bait or carcass over five (5) pounds in weight. As used in this subsection, "exposed bait or carcass" means the meat or viscera of any part of a mammal, bird or fish, excluding dried bones. In addition, all snares used for taking furbearing or predatory animals shall be equipped with a break-away locking device that is designed to release at two hundred ninety-five (295) pounds of pressure or less and a snare loop not to exceed twelve (12) inches in diameter measured side to side. Unless otherwise specified in this section, all traps, excluding snares set for furbearing animals and predatory animals and quick kill body grip traps as defined by commission rule and regulation, shall be checked by the owner at least once during each seventy-two (72) hour period from the time the traps were set. Quick kill body grip traps shall be checked by the owner not less than once each seven (7) day period from the time the traps were set. All wildlife caught in any trap or snare shall upon discovery, be removed immediately by the owner. Violation of this subsection constitutes a ninth degree misdemeanor. After the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108 the commission may enact rules and regulations setting forth the specifications for traps and snares used for the taking of gray wolves and the time period for checking such traps and snares. Except as otherwise provided by commission rule, the provisions in this section regulating the trapping of furbearing and predatory animals shall apply to the trapping of gray wolves.

**23-3-102.    Taking certain game animals without license or during a closed season prohibited.**

(b)    Any person who takes any bighorn sheep, mountain goat, mountain lion, ~~or~~ grizzly bear or, gray wolf where classified as a trophy game animal, without the proper license except as otherwise permitted by this act is guilty of a 4th degree misdemeanor.

**23-3-115.    Taking black bear, mountain lion, gray wolf, bobcat, weasel, badger, squirrels or muskrat for damaging property.**

(c)    The provisions of subsection (a) of this section relating to the taking of animals doing damage to private property shall apply to gray wolves from and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108. The owner, employee or lessee acting under authority of this section shall notify the department of the killing of a gray wolf within an area of the state in which the gray wolf is classified as a trophy game animal. The notification shall be made within ten (10) days of the kill unless the gray wolf was taken in an area where wolves have been classified as trophy game animals pursuant to W.S. 23-1-304(b)(i)(A) in which case the notification shall be made within seventy-two (72) hours.

**23-3-301.    Importation and sale of wildlife prohibited; exceptions.**

(a)    No person shall import into Wyoming from any source any living antelope, bear, deer, elk, moose, mountain goat, mountain lion, bighorn sheep, wolf, wolf hybrid nor any living wildlife except as otherwise permitted by this act.

(b)    No person shall sell any living antelope, bear, deer, elk, moose, mountain goat, mountain lion, bighorn sheep, wolf, wolf hybrid or falcon except as permitted by the commission.

**23-3-304.    Certain trapping devices unlawful; game for bait prohibited; baiting big game animals prohibited; penalties.**

(a)    No person shall take or wound any game animal, game bird, or game fish by use of any pit, pitfall, net, trap, deadfall, poison, or other similar device except as otherwise provided. From and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108, gray wolves may be taken with a trap or snare only as allowed by and in accordance with rules and regulations of the commission.

**Section 3.**    Nothing in this act shall prohibit the ownership of a wolf hybrid if the animal was owned before the effective date of this act by a person then residing in this state.

**Section 4.**

(a)    It is the purpose of this act, unless the introduction of the gray wolf into Wyoming is determined by lawful authorities not to have been in accordance with federal law, to provide appropriate state manage-

ment and control of gray wolves in order to facilitate the removal of the gray wolf from its listing as an experimental nonessential population, endangered species or threatened species in Wyoming and to prevent future listing of the gray wolf as an experimental nonessential population, endangered species or threatened species.

(b)   In providing appropriate state management and control of gray wolves, the state acknowledges the need to fill the current vacuum of management of this species within the state. The state retains all rights to investigate and, if determined by state officials to be appropriate, take legal actions against the federal government relating to the introduction of the gray wolf into the boundaries of this state.

(c)   In order to accomplish the purposes of this act, the game and fish commission shall enter into a memorandum of understanding with appropriate federal agencies under which the commission and federal agencies shall endeavor to manage the prey base for gray wolves in a manner to maintain a sufficient prey base in Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway within the state for at least eight (8) packs of wolves. The game and fish commission shall endeavor to manage big game populations providing a prey base for seven (7) packs of gray wolves in all other areas of the state in such a manner as to mitigate to the greatest extent possible, adverse effects on opportunities for licensed hunters to take big game.

(d)   The game and fish commission shall report to the joint travel, recreation, wildlife and cultural resources interim committee not later than September 1, 2003, regarding the implementation of this act.

**Section 5.**  This act is effective immediately upon completion of all acts necessary for a bill to become law as provided by Article 4, Section 8 of the Wyoming Constitution.

Approved March 4, 2003.

## Chapter 116

### VOLUNTEER HEALTH CARE PROFESSIONALS CERTIFICATION

Original House Bill No. 149

AN ACT relating to volunteer health care professionals; providing a volunteer license for retired dentists and dental hygienists, optometrists, physicians, osteopaths, nurses and physician assistants as specified; conforming provisions; and providing for an effective date.

*Be It Enacted by the Legislature of the State of Wyoming:*

**Section 1.**  W.S. 33-15-131, 33-21-157, 33-23-117 and 33-26-601 are created to read: